# ℏEYER & ASSOCIATES, P.A.

### Attorneys at Law

Barbara A. Heyer

1311 S.E. 4th Avenue
Fort Lauderdale, Florida 33316

---
Broward: (954) 522-4922
Palm Beach: (561) 833-1068
Fax: (954) 522-4955

August 31, 2001

Mayor Joseph Carollo
CITY OF MIAMI
444 SW 2nd Avenue
Miami, FL   33130

02-cv-21072-AJ

RE:  <u>Jerry Frank Townsend</u>

Dear Mayor Carollo:

Pursuant to Florida Statutes, Chapter 768.28, notice is hereby given of our intent to bring a lawsuit on behalf of Jerry Townsend for damages suffered as a result of his wrongful arrest on September 6, 1979 by members of your police department and his subsequent incarceration and conviction.

This notice applies to the officials of the City of Miami and the appropriate police officers of the City of Miami Police Department.

The following documents, now being the subject of litigation, may not be destroyed, pursuant to Florida law:

1.  Complaints of police misconduct.
2.  Investigations of possible police misconduct.
3.  Letters of intent to sue based on claims of police misconduct.
4.  Documents reflecting settlements or releases relating to allegations of police misconduct.
5.  Disciplinary measures imposed against members of your police department.
6.  Personnel files of members of your police department.
7.  Any investigations, tapes and/or police reports concerning the arrests of Jerry Frank Townsend.

In addition, I am requesting that the following materials be made available for my review:





*Heyer & Associates, P.A.*

Page -2-

1.  Any logbooks, lists, or other materials in your
    possession or control reflecting complaints of police
    misconduct.  These materials shall include complaints,
    whether investigated or not, and whether filed by
    civilians or internally, covering the period of 1979 to
    the present.

2.  All policy and procedure manuals in effect during the
    years 1978, 1979, and 1980.

3.  All documents reflecting the incident at issue.  These
    materials shall include all statements, photographs,
    reports, videotapes, witness lists, lists of persons
    interviewed, supervisory and self evaluations, etc.
    obtained.

4.  All documentation reflecting the follow-up
    investigation of the incident at issue.  These
    materials shall include all reports or other materials
    prepared in anticipation of, or as a result of, any
    such investigation including all statements,
    photographs, reports, videotapes, witness lists, lists
    of persons interviewed, etc.

5.  The personnel files of all police officers who were
    involved in the investigation and arrests of Jerry
    Frank Townsend. These files shall include those of
    supervisory personnel as well as the actual
    participants in the incident at issue.

I would like to view these materials on September 28, 2001
at 2:00 PM.  Please confirm that these materials will be
available for my review at that time.   Thank you for your
assistance in this matter.

Very truly yours,

Barbara A. Heyer

BAH/aa

cc:  Katherine Fernandez Rundle, Esq.
     Chief Raul Martinez
     Alejandro Vilarello, Esq.

Certified Mail No. Z401400344- Return Receipt Requested

**Z 401 400 344**

US Postal Service
### Receipt for Certified Mail
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

Sent to *Mayor Joseph Carollo*

Street & Number *444 SW 2 Avenue*

Post Office, State, & ZIP Code *Miami, FL  33130*

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| **TOTAL** Postage & Fees | $ 3 95 |
| Postmark or Date | |

PS Form 3800, April 1995

---

● **SENDER:** Complete items 1 and 2 when additional services are desired, and complete items 3 and 4.
Put your address in the "RETURN TO" Space on the reverse side. Failure to do this will prevent this card from being returned to you. The return receipt fee will provide you the name of the person delivered to and the date of delivery. For additional fees the following services are available. Consult postmaster for fees and check box(es) for additional service(s) requested.

1. ☐ Show to whom delivered, date, and addressee's address.    2. ☐ Restricted Delivery
   *(Extra charge)*                                                *(Extra charge)*

3. Article Addressed to:
Mayor Joseph Corollo
CITY OF MIAMI
444 SW 2 Avenue
Miami, FL  33130

**CITY OF MIAMI**

4. Article Number
Z 401 400 344

Type of Service
☐ Registered      ☐ Insured
☑ Certified       ☐ COD
☐ Express Mail    ☐ Return Receipt
                     for Merchandise

Always obtain signature of addressee or agent and DATE DELIVERED.

5. Signature — Addressee
X

6. Signature — Agent
X

7. Date of Delivery  9/4

8. Addressee's Address *(ONLY if requested and fee paid)*

PS Form 3811, Apr. 1989    ✰U.S.G.P.O. 1989-238-815    **DOMESTIC RETURN RECEIPT**

## H*E*YER & ASSOCIATES, *P.A.*

Attorneys at Law

Barbara A. Heyer

1311 S.E. 4th Avenue
Fort Lauderdale, Florida 33316

Broward: (954) 522-4922
Palm Beach: (561) 833-1068
Fax: (954) 522-4955

August 31, 2001

Insurance Commissioner
The Capitol
PL 11
Tallahassee, FL 32301

RE:   Jerry Frank Townsend v. Broward Sheriff's Office
      Jerry Frank Townsend v. City of Miami, et al.

To the Department of Insurance:

Pursuant to Florida Statutes, the attached letters directed
to Mayor Joseph Carollo of the City of Miami and Sheriff Kenneth
Jenne of Broward County are being sent to your office to provide
notice of our intent to file a lawsuit on behalf of Jerry Frank
Townsend.

Very truly yours,

Barbara A. Heyer

BAH/phr

Enc

Certified Mail No. Z401400345- Return Receipt Requested

**Z 401 400 345**

US Postal Service
### Receipt for Certified Mail
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

Sent to _Dept. of Insurance_

Street & Number _The Capitol, PL 11_

Post Office, State, & ZIP Code _Tallahassee, FL 32301_

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| **TOTAL** Postage & Fees | $ 3 95 |
| Postmark or Date | |

PS Form **3800**, April 1995

---

● **SENDER:** Complete items 1 and 2 when additional services are desired, and complete items 3 and 4.
Put your address in the "RETURN TO" Space on the reverse side. Failure to do this will prevent this card from being returned to you. The return receipt fee will provide you the name of the person delivered to and the date of delivery. For additional fees the following services are available. Consult postmaster for fees and check box(es) for additional service(s) requested.
1. ☐ Show to whom delivered, date, and addressee's address.   2. ☐ Restricted Delivery
*(Extra charge)*   *(Extra charge)*

| 3. Article Addressed to: | 4. Article Number |
|---|---|
| Insurance Commissioner<br>THe Capitol, PL 11<br>Tallahassee, FL  32301 | Z401 400 345 |
| | Type of Service:<br>☐ Registered   ☐ Insured<br>☒ Certified   ☐ COD<br>☐ Express Mail   ☐ Return Receipt for Merchandise |
| | Always obtain signature of addressee or agent and DATE DELIVERED. |
| 5. Signature — Addressee<br>X   **DEPARTMENT OF INSURANCE**<br>6. Signature — Agent **TREASURER AND FIRE MARSHAL**<br>X   **SINEP**   **CENTER SUPERVISOR** | 8. Addressee's Address *(ONLY if requested and fee paid)* |
| 7. Date of Delivery   **SEP 05 2001** | |

PS Form **3811**, Apr. 1989   ＊U.S.G.P.O. 1989-238-815   **DOMESTIC RETURN RECEIPT**





IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                    :
    Plaintiff,                         :    Case No:    79-007211CF10A
                                     :
v.                                   :    Judge    KAPLAN
                                     :
JERRY FRANK TOWNSEND,                :
    Defendant.                         :
                                     :

---

## ORDER ON STATE'S MOTION TO VACATE AND SET ASIDE JUDGMENT AND SENTENCE FOR THE DEFENDANT'S CONVICTION UNDER COUNT III OF THE INDICTMENT

THIS CAUSE having come before this Court upon the State's Motion to Vacate and Set Aside Judgment and Sentence for the Defendant's Conviction Under Count III of the Indictment, and the Court having considered same, and being fully advised in the premises, it is hereby,

ORDERED AND ADJUDGED that the State's Motion to Vacate and Set Aside Judgment and Sentence for the Defendant's Conviction Under Count III of the Indictment is hereby GRANTED, for the reasons contained in the State's Motion, a copy of which is attached hereto.

DONE AND ORDERED in Chambers, at the Broward County Courthouse, 201 Southeast Sixth Street, Fort Lauderdale, Broward County, Florida 33301, dated this _3 d_ day of April, 2001.

STANTON S. KAPLAN

---

STANTON S. KAPLAN
CIRCUIT COURT JUDGE
    A TRUE COPY



IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                    :        CASE NO. : 79-007211CF10A
        Plaintiff,                :
                      :        JUDGE: KAPLAN
                      :
vs.                                  :
                      :
JERRY FRANK TOWNSEND,                 :
        Defendant.                :
                      :
.............................:

## STATE'S MOTION TO VACATE AND SET ASIDE
## JUDGMENT AND SENTENCE FOR THE DEFENDANT'S
## CONVICTION UNDER COUNT III OF THE INDICTMENT

**COMES NOW**, Michael J. Satz, State Attorney, Seventeenth Judicial Circuit, Broward County, Florida, on behalf of the State of Florida, by and through the undersigned Assistant State Attorney, and moves this Honorable Court pursuant to Florida Rule of Criminal Procedure 3.850 to vacate and set aside the judgment and sentence of Jerry Frank Townsend for his conviction under Count III of the Indictment, and as grounds therefore , states as follows:

    1. Jerry Frank Townsend was charged in a three count Indictment with:

Count I - First degree murder of Ernestine German

Count II - First degree murder of Cathy Moore

Count III - First degree murder of Terry Cummings

    2. On October 4, 1982, Jerry Frank Townsend plead guilty of the murders of Cathy Moore and Terry Cummings. The State nolle prossed the charge for the murder of Ernestine German.

    3. Jerry Frank Townsend was sentenced on that same date to two life sentences for his convictions on Counts II and III of the Indictment. These sentences were to run concurrently with the sentence imposed in case number 79-7217CF.

4. No appeal was taken.

5. Jerry Frank Townsend filed a Motion to Correct Illegal Sentence on November 13, 1998. That motion was denied by Judge Victor Tobin on March 16, 1999. It does not appear that Jerry Frank Townsend has filed any other post-conviction motions.

6. DNA Testing performed by the BSO Laboratory has revealed that Jerry Frank Townsend has been excluded as the perpetrator in the murder of Terry Cummings. This information was released by the Broward Sheriff's Office on Friday, April 27, 2001.

7. Opposing counsel Barbara Heyer has no objection to the granting of this motion.

8. Based on the foregoing, the State moves this Court to vacate the judgment and sentence imposed under Count III of the Indictment, the murder of Terry Cummings, and enter any order it deems proper.

**WHEREFORE**, the State respectfully requests that this Court **GRANT** it's Motion to Vacate and Set Aside the Judgment and Sentence regarding Jerry Frank Townsend's 1982 plea of guilty and conviction for the murder of Terry Cummings.

Respectfully submitted,

MICHAEL J. SATZ
State Attorney

**CAROLYN V. McCANN**
Assistant State Attorney
Bar No. 380393
Broward County Courthouse
201 SE 6th Street, Suite 675
Ft. Lauderdale, Florida 33301
Telephone: (954) 831-7913

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing has been furnished to:  Lewis A. Fishman, Esquire, Lewis A. Fishman, P.A., 8211 W. Broward Boulevard, Suite 420, Plantation, Florida 33324 and to Barbara A. Heyer, Esquire, Heyer & Associates, P.A. 1311 SE 4th Avenue, Fort Lauderdale, Florida 33316, this _____ day of April, 2001.


OF COUNSEL

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,
    Plaintiff,

v.

JERRY FRANK TOWNSEND,
    Defendant.

:
:  Case No:  79-007217CF10A
:
:  Judge    TOBIN
:
:
:
:

## ORDER ON STATE'S MOTION TO VACATE AND SET ASIDE JUDGMENT AND SENTENCE FOR THE DEFENDANT'S CONVICTION UNDER COUNT I OF THE INDICTMENT

THIS CAUSE having come before this Court upon the State's Motion to Vacate and Set Aside Judgment and Sentence for the Defendant's Conviction Under Count I of the Indictment, and the Court having considered same, and being fully advised in the premises, it is hereby,

ORDERED AND ADJUDGED that the State's Motion to Vacate and Set Aside Judgment and Sentence for the Defendant's Conviction Under Count I of the Indictment is hereby GRANTED, for the reasons contained in the State's Motion, a copy of which is attached hereto.

DONE AND ORDERED in Chambers, at the Broward County Courthouse, 201 Southeast Sixth Street, Fort Lauderdale, Broward County, Florida 33301, dated this 2 day of April, 2001.

VICTOR TOBIN

_____
VICTOR TOBIN
CIRCUIT COURT JUDGE   A TRUE COPY



PLAINTIFF'S
EXHIBIT
D

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
## IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                    :          CASE NO. : 79-007217CF10A
     Plaintiff,                        :
                            :          JUDGE: TOBIN
                            :
vs.                                              :

JERRY FRANK TOWNSEND,                :
     Defendant.                        :
                            :
...............................................:

### STATE'S MOTION TO VACATE AND SET ASIDE
### JUDGMENT AND SENTENCE FOR THE DEFENDANT'S
### CONVICTION UNDER COUNT I OF THE INDICTMENT

**COMES NOW**, Michael J. Satz, State Attorney, Seventeenth Judicial Circuit, Broward County, Florida, on behalf of the State of Florida, by and through the undersigned Assistant State Attorney, and moves this Honorable Court pursuant to Florida Rule of Criminal Procedure 3.850 to vacate and set aside the judgment and sentence of Jerry Frank Townsend for his conviction under Count I of the Indictment, and as grounds therefore , states as follows:

1.  Jerry Frank Townsend was charged in a three count Indictment with:

Count I - First degree murder of Naomi Gamble

Count II - First degree murder of Thelma Bell

Count III - First degree murder of Barbara Brown

2.  After a trial by jury, Jerry Frank Townsend was found guilty on July 31, 1980 of the murders of Naomi Gamble and Barbara Brown.  He was found not guilty of Count II, the murder of Thelma Bell.

3.  Jerry Frank Townsend was sentenced on July 31, 1980 to two consecutive life sentences for his convictions on Counts I and III of the Indictment.

4. The proceedings were presided over by Judge Arthur J. Franza, Circuit Court, Seventeenth Judicial Circuit, Broward County, Florida.

5. The Florida Fourth District Court of Appeals affirmed Jerry Frank Townsends convictions and sentences. Townsend v. State, 420 So. 2d 615 (Fla. 1982). The Supreme Court of Florida denied certiorari on April 14, 1983.

6. Jerry Frank Townsend filed a Motion to Correct Illegal Sentence on November 13, 1998. That motion was denied by this Court on March 16, 1999. It does not appear that Jerry Frank Townsend has filed any other post-conviction motions.

7. DNA Testing performed by the BSO Laboratory has revealed that Jerry Frank Townsend has been excluded as the perpetrator in the murder of Naomi Gamble. This information was released by the Broward Sheriff's Office on Friday, April 27, 2001.

8. Attorney Barbara Heyer has represented that counsel for the Defendant Lewis Fishman has no objection to the granting of this motion.

9. Based on the foregoing, the State moves this Court to vacate the judgment and sentence imposed under Count I of the Indictment, the murder of Naomi Gamble, and enter any order it deems proper.

**WHEREFORE**, the State respectfully requests that this Court **GRANT** it's Motion to Vacate and Set Aside the Judgment and Sentence regarding Jerry Frank Townsend's 1980 conviction for the murder of Naomi Gamble under Count I of the Indictment.

Respectfully submitted,

MICHAEL J. SATZ
State Attorney

CAROLYN V. McCANN
Assistant State Attorney
Bar No. 380393
Broward County Courthouse
201 SE 6th Street, Suite 675
Ft. Lauderdale, Florida 33301
Telephone: (954) 831-7913

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true copy of the foregoing has been furnished to:  Lewis A. Fishman, Esquire, Lewis A. Fishman, P.A., 8211 W. Broward Boulevard, Suite 420, Plantation, Florida 33324 and to Barbara A. Heyer, Esquire, Heyer & Associates, P.A. 1311 SE 4th Avenue, Fort Lauderdale, Florida 33316, this 27 day of April, 2001.

OF COUNSEL

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,        :
    Plaintiff,           : Case No:   79-007217CF10A
                         :
v.                       : Judge      TOBIN
                         :
JERRY FRANK TOWNSEND,    :
    Defendant.           :
_____ :

### ORDER ON STATE'S MOTION TO VACATE AND SET ASIDE JUDGMENT AND SENTENCE FOR THE DEFENDANT'S CONVICTION UNDER COUNT III OF THE INDICTMENT

    **THIS CAUSE** having come before this Court upon the State's Motion to Vacate and Set Aside Judgment and Sentence for the Defendant's Conviction Under Count III of the Indictment, and the Court having considered same, and being fully advised in the premises, it is hereby,

    **ORDERED AND ADJUDGED** that the State's Motion to Vacate and Set Aside Judgment and Sentence for the Defendant's Conviction Under Count III of the Indictment is hereby **GRANTED**, for the reasons contained in the State's Motion, a copy of which is attached hereto.

    **DONE AND ORDERED** in Chambers, at the Broward County Courthouse, 201 Southeast Sixth Street, Fort Lauderdale, Broward County, Florida 33301, dated this _14_ day of May, 2001.

                                      _____   ~~VICTOR TOBIN~~
                                        **VICTOR TOBIN**
                                        CIRCUIT COURT JUDGE  A TRUE COPY



PLAINTIFF'S
EXHIBIT
B

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,       :            CASE NO. : 79-007217CF10A
      Plaintiff,     :

                   :            JUDGE: TOBIN
                   :

vs.                :

JERRY FRANK TOWNSEND,  :
      Defendant.    :

                   :
............................................:

## STATE'S MOTION TO VACATE AND SET ASIDE
## JUDGMENT AND SENTENCE FOR THE DEFENDANT'S
## CONVICTION UNDER COUNT III OF THE INDICTMENT

**COMES NOW**, Michael J. Satz, State Attorney, Seventeenth Judicial Circuit, Broward County, Florida, on behalf of the State of Florida, by and through the undersigned Assistant State Attorney, and moves this Honorable Court pursuant to Florida Rule of Criminal Procedure 3.850 to vacate and set aside the judgment and sentence of Jerry Frank Townsend for his conviction under Count III of the Indictment, and as grounds therefore , states as follows:

1.  Jerry Frank Townsend was charged in a three count Indictment with:

Count I - First degree murder of Naomi Gamble

Count II - First degree murder of Thelma Bell

Count III - First degree murder of Barbara Brown

2.  After a trial by jury, Jerry Frank Townsend was found guilty on July 31, 1980 of the murders of Naomi Gamble and Barbara Brown. He was found not guilty of Count II, the murder of Thelma Bell.

3.  Jerry Frank Townsend was sentenced on July 31, 1980 to two consecutive life sentences for his convictions on Counts I and III of the Indictment.

4.  The proceedings were presided over by Judge Arthur J. Franza, Circuit Court, Seventeenth Judicial Circuit, Broward County, Florida.

5.  The Florida Fourth District Court of Appeals affirmed Jerry Frank Townsends convictions and sentences.  Townsend v. State, 420 So. 2d 615 (Fla. 1982).  The Supreme Court of Florida denied certiorari on April 14, 1983.

6.  Jerry Frank Townsend filed a Motion to Correct Illegal Sentence on November 13, 1998.  That motion was denied by this Court on March 16, 1999.  It does not appear that Jerry Frank Townsend has filed any other post-conviction motions.

7.  On May 2, 2001 this Court entered an Order vacating Jerry Frank Townsend's conviction and sentence under Count I of the Indictment pursuant to the State's Motion to Vacate after DNA Testing performed by the BSO Laboratory has revealed that Jerry Frank Townsend had been excluded as the perpetrator in the murder of Naomi Gamble.

8.  The only remaining count against Jerry Frank Townsend under the Indictment is for Count III; the murder of Barbara Brown.

9.  Based upon the fact that the murders to which Jerry Frank Townsend had confessed were used as collateral crimes evidence against him, and that recent DNA testing in several of those cases has excluded him as the perpetrator, a review of the Barbara Brown homicide was conducted by the Broward State Attorney's Office.  A review of the case indicates that there is no physical evidence to corroborate Jerry Frank Townsend's confession to the murder of Barbara Brown.  The lack of physical evidence, coupled with Jerry Frank Townsend's exclusion as the perpetrator in several of the collateral crimes cases, requires that in the interest of justice, his conviction and sentence under Count III of the Indictment be vacated.

10. Base on the foregoing, the State moves this Court to vacate the judgment and sentence imposed under Count III of the Indictment, the murder of Barbara Brown, and enter any order it deems proper.

**WHEREFORE**, the State respectfully requests that this Court **GRANT** it's Motion to Vacate and Set Aside the Judgment and Sentence regarding Jerry Frank Townsend's 1980 conviction for the murder of Barbara Brown under Count III of the Indictment.

Respectfully submitted,

MICHAEL J. SATZ
State Attorney

CAROLYN V. McCANN
Assistant State Attorney
Bar No. 380393
Broward County Courthouse
201 SE 6th Street, Suite 675
Ft. Lauderdale, Florida 33301
Telephone: (954) 831-7913

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true copy of the foregoing has been furnished to: Lewis A. Fishman, Esquire, Lewis A. Fishman, P.A., 8211 W. Broward Boulevard, Suite 420, Plantation, Florida 33324 and to Barbara A. Heyer, Esquire, Heyer & Associates, P.A. 1311 SE 4th Avenue, Fort Lauderdale, Florida 33316, this __(0)__ day of May, 2001.

OF COUNSEL

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                    :
    Plaintiff,                       : Case No:   79-007211CF10A
                                     :
v.                                   : Judge    KAPLAN
                                     :
JERRY FRANK TOWNSEND,                :
    Defendant.                       :
_____     :

### ORDER ON STATE'S MOTION TO VACATE AND SET ASIDE JUDGMENT AND SENTENCE FOR THE DEFENDANT'S CONVICTION UNDER COUNT II OF THE INDICTMENT

**THIS CAUSE** having come before this Court upon the State's Motion to Vacate and Set Aside Judgment and Sentence for the Defendant's Conviction Under Count II of the Indictment, and the Court having considered same, and being fully advised in the premises, it is hereby,

**ORDERED AND ADJUDGED** that the State's Motion to Vacate and Set Aside Judgment and Sentence for the Defendant's Conviction Under Count II of the Indictment is hereby **GRANTED**, for the reasons contained in the State's Motion, a copy of which is attached hereto.

**DONE AND ORDERED** in Chambers, at the Broward County Courthouse, 201 Southeast Sixth Street, Fort Lauderdale, Broward County, Florida 33301, dated this _14_ day of May, 2001.

STANTON S. KAPLAN
_____
STANTON S. KAPLAN
CIRCUIT COURT JUDGE

A TRUE COPY

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                :         CASE NO. : 79-007211CF10A
      Plaintiff,               :
                   :         JUDGE: KAPLAN
                   :
vs.                              :
                   :
JERRY FRANK TOWNSEND,            :
      Defendant.               :
                   :
...................................:

## STATE'S MOTION TO VACATE AND SET ASIDE
## JUDGMENT AND SENTENCE FOR THE DEFENDANT'S
## CONVICTION UNDER COUNT II OF THE INDICTMENT

**COMES NOW**, Michael J. Satz, State Attorney, Seventeenth Judicial Circuit, Broward County, Florida, on behalf of the State of Florida, by and through the undersigned Assistant State Attorney, and moves this Honorable Court pursuant to Florida Rule of Criminal Procedure 3.850 to vacate and set aside the judgment and sentence of Jerry Frank Townsend for his conviction under Count II of the Indictment, and as grounds therefore , states as follows:

1. Jerry Frank Townsend was charged in a three count Indictment with:

Count I - First degree murder of Ernestine German

Count II - First degree murder of Cathy Moore

Count III - First degree murder of Terry Cummings

2. On October 4, 1982, Jerry Frank Townsend plead guilty of the murders of Cathy Moore and Terry Cummings. The State nolle prossed the charge for the murder of Ernestine German.

3. Jerry Frank Townsend was sentenced on that same date to two life sentences for his convictions on Counts II and III of the Indictment. These sentences were to run concurrently with the sentence imposed in case number 79-7217CF.

4. No appeal was taken.

5. Jerry Frank Townsend filed a Motion to Correct Illegal Sentence on November 13, 1998. That motion was denied by Judge Victor Tobin on March 16, 1999. It does not appear that Jerry Frank Townsend has filed any other post-conviction motions.

6. On April 30, 2001 this Court entered an Order vacating Jerry Frank Townsend's conviction and sentence under Count III of the Indictment pursuant to the State's Motion to Vacate after DNA testing performed by the BSO Laboratory revealed that Jerry Frank Townsend had been excluded as the perpetrator in the murder of Terry Cummings.

7. The only remaining count against Jerry Frank Townsend under the Indictment is Count II; the murder of Cathy Moore.

8. Based upon the fact that the murders to which Jerry Frank Townsend had confessed were used as collateral crimes evidence against him, and that recent DNA testing in several of those cases had excluded him as the perpetrator, a review of the Cathy Moore homicide was conducted by the Broward State Attorney's Office. A review of the case indicates that there is no physical evidence to corroborate Jerry Frank Townsend's confession to the murder of Cathy Moore. The lack of physical evidence, coupled with Jerry Frank Townsend's exlusion as the perpetrator in several of the collateral crimes cases, requires that in the interest of justice, his conviction and sentence under Count II of the Indictment be vacated.

9. Opposing counsel Barbara Heyer has no objection to the granting of this motion.

10. Based on the foregoing, the State moves this Court to vacate the judgment and sentence imposed under Count II of the Indictment, the murder of Cathy Moore, and enter any order it deems proper.

WHEREFORE, the State respectfully requests that this Court **GRANT** it's Motion to Vacate and Set Aside the Judgment and Sentence regarding Jerry Frank Townsend's 1982 plea of guilty and conviction for the murder of Cathy Moore.

Respectfully submitted,

MICHAEL J. SATZ
State Attorney

CAROLYN V. McCANN
Assistant State Attorney
Bar No. 380393
Broward County Courthouse
201 SE 6th Street, Suite 675
Ft. Lauderdale, Florida 33301
Telephone: (954) 831-7913

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing has been furnished to: Lewis A. Fishman, Esquire, Lewis A. Fishman, P.A., 8211 W. Broward Boulevard, Suite 420, Plantation, Florida 33324 and to Barbara A. Heyer, Esquire, Heyer & Associates, P.A. 1311 SE 4th Avenue, Fort Lauderdale, Florida 33316, this __10__ day of May, 2001.

**OF COUNSEL**



**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT**
**IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

THE STATE OF FLORIDA,                     Case No. 79-14619, 79-14698, 79-15569

vs.                                       Judge Silverman

JERRY FRANK TOWNSEND a/k/a
MICHAEL SMITH,

             Defendant.

---

### ORDER GRANTING MOTION TO VACATE JUDGMENTS AND SENTENCES

This matter having come before this Court on the State of Florida's Motion to Vacate Judgments and Sentences in the above case numbers and the Court having reviewed the motion, heard from counsel and being otherwise advised of the premises therein HEREBY grants the State's Motion to Vacate and ORDERS that the Judgments and Sentences in State of Florida v. Jerry Frank Townsend a/k/a Michael Smith, case nos. 79-14619, 79-14698 and 79-15569 are VACATED.

DONE AND ORDERED in Miami, Miami-Dade County, on the 15 day of June, 2001.

                            SCOTT SILVERMAN
                            Circuit Court Judge

cc: David Gilbert, Assistant State Attorney
    Herbert Smith, Assistant Public Defender



**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

THE STATE OF FLORIDA,                    Case No. 79-14619, 79-14698, 79-15569

vs.                                                      Judge Silverman

JERRY FRANK TOWNSEND a/k/a
MICHAEL SMITH,

                    Defendant.

---

## MOTION TO VACATE JUDGMENTS AND SENTENCES

The State of Florida, by and through its undersigned counsel, respectfully requests

that this Court vacate the Judgments and Sentences in the above case numbers and as

grounds therefore, states as follows:

1.      On September 6, 1979, the defendant was arrested for the First Degree

Murder and Sexual Battery of Dorothy Gibson, in case no. 79- 15569, which occurred on

or about June 25, 1977; the first Degree Murder and Sexual Battery of Wanda Virga in

case no. 79-14698, which occurred between August 29 and September 3, 1979; and the

Armed Sexual Battery of Pilbyian Beckford, in case no. 79-14619, which occurred on

September 5, 1979.  He was indicted for the homicides on September 19, 1979 and

November 28, 1979, respectively, and he was also subsequently formally charged with

the Armed Sexual Battery.

2.      On September 26, 1979, the defendant was indicted in Broward County

and charged with seven counts of First Degree Murder.  In Broward County Case No. 79-

7217 CF-10-A, he was charged with three counts of First Degree Murder for crimes that

occurred in 1973.  In Broward County Case No. 79-7211 CF-10-A, the defendant was

charged with three counts of First Degree Murder for crimes that occurred in 1979. In Broward County Case No. 79-7214 CF-10-A, he was charged with one count of First Degree Murder which also occurred in 1979. While the charges in Dade County were pending, the defendant was brought to trial in Broward County on the three homicides charged in Case No. 79-7217 CF-10-A. All the Broward homicides, as well as the two Dade County homicides were introduced as Williams Rule evidence. The defendant was convicted of two of the homicides and acquitted of the third. He was sentenced to two consecutive life sentences with twenty-five year minimum mandatory sentences. On September 8, 1982, the defendant's convictions and sentences were affirmed by the Fourth District Court of Appeal. Townsend v. State, 420 So.2d 615 (Fla. 4th DCA 1982). Rehearing was denied on November 3, 1982. On October 4, 1982, after the affirmance, and pursuant to a plea agreement, the State, in the Broward County cases, nolle prossed the one murder charge in case no. 79-7214-CF-10-A, and one murder charged in case no. 79-7211 CF-10-A. The defendant pled guilty to Second Degree Murder for the two remaining murder charges in case no. 79-7211 CF-10-A.

3.     On December 6, 1982, the defendant entered a plea of guilty in the Dade County cases. He plead guilty to Second Degree Murders and Sexual Batteries of Dorothy Gibson and Wanda Virga. The defendant was sentenced to concurrent terms of life in prison on both of the Second Degree Murder charges and the sentence was suspended on both of the Sexual Battery counts. At the same time, the defendant pled guilty to the Armed Sexual Battery of Pilbyian Beckford. In that case he was sentenced to a concurrent term of life in prison. The sentences were ordered to run concurrent only with the Second Degree Murder charges in the Broward County case.

4.     In April and May of 2001, DNA testing, an identity testing mechanism, which did not exist at the time of the defendant's original convictions, provided new evidence which led to vacating of all of the Broward County convictions on motions filed by the State.  The vacating of those convictions prompted the State to undertake an exhaustive and thorough reexamination of the three Dade County cases, including: a review of all potential and existing evidence; a review of all the confession tapes and transcripts; extensive interviews of the police officers involved in the original case investigations; a lengthy, exhaustive search to locate the witnesses to the 1979 sexual battery of Pilbyian Beckford; and conferences with the members of the Miami Police Department.  Due to the fact that the defendant's pleas in the Dade cases were motivated by the convictions in the Broward cases, the law requires that these Dade convictions and sentences be vacated.  Furthermore, as a result of the review of the evidence, the State has determined that there exists a reasonable doubt as to whether the defendant committed the murder of Dorothy Gibson, and that due to the problems in the availability of evidence, witnesses and other factors, the State will not be able to continue the prosecution of the murder of Wanda Virga and the sexual battery of Pilbyian Beckford.  As such, the interests of justice require that the State request that this Court vacate the defendant's convictions and sentences in the above styled cases.

WHEREFORE, the State of Florida respectfully requests that this Court grant its Motion to Vacate Judgments and Sentences and set aside the defendant's convictions and sentences in case nos. 79-14619, 79-14698, 79-15569.

Respectfully Submitted,

KATHERINE FERNANDEZ RUNDLE
State Attorney

By:_____

David I. Gilbert
Assistant State Attorney
Florida Bar # 150062
1350 N.W. 12 Ave.
Miami, Fl. 33136
(305) 547-0305

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent to Herbert Smith, Assistant Public Defender, 1320 N.W. 14th Street, Miami, Fl 33125 on this ___ day of June, 2001.

By:_____

David I. Gilbert
Assistant State Attorney



U.S. Department of Justice

Civil Rights Division

SHR:SYBC:CT:LES:SP:LDB:DB:odw
DJ 207-18-4

*Special Litigation Section - PHB*
*930 Pennsylvania Avenue N.W.*
*Washington, DC 20530*

March 13, 2003

Mr. Alejandro Vilarello
City Attorney
City Attorney's Office
Miami Riverside Center
444 NW 2nd Avenue
Miami, FL 33130

Re:   <u>Investigation of the Miami Police Department</u>

Dear Mr. Vilarello:

As you know, the Civil Rights Division is conducting an
investigation of the Miami Police Department (MPD), pursuant to
the Violent Crime Control and Law Enforcement Act of 1994,
42 U.S.C. § 14141 ("Section 14141").  In 2002, Mayor Manuel Diaz
and Chief Raul Martinez separately requested a thorough
investigation by the Civil Rights Division of the MPD's policies,
procedures, and practices.  As an initial matter, we would like
to express our appreciation for the considerable cooperation we
have received thus far from the City, Chief John Timoney, former
Chief Martinez, and the men and women of the Miami Police
Department.

At the beginning of our investigation, we told you that we
would inform you as soon as possible if concerns arose during the
course of the investigation.  To date, we and our consultants
have reviewed relevant policies and procedures, interviewed City
officials, members of the Office of Professional Compliance and
the Community Relations Board, and a broad cross-section of
members of the MPD, including command-level and line officers.
We have also talked with representatives of the Fraternal Order
of Police and the Miami Community Police Benevolent Association,
as well as community leaders and citizens.  Based on this
preliminary review, we have identified several areas of concern,
which we set forth below, along with our recommendations for



PLAINTIFF'S
EXHIBIT
4

- 2 -

addressing these problems. We have previously addressed most of these areas of concern in our exit interviews with Chief Martinez, the command staff, and the training staff. Additionally, on January 29, 2003, we gave Chief Timoney an overview of our preliminary concerns and recommendations thus far.

Important aspects of our fact gathering process have yet to be completed, most notably reviewing incident reports, shootings files, citizen complaint files, arrest reports, and early warning system files. This letter is not meant to be exhaustive, but rather focuses on significant concerns we have identified and recommendations we can provide based on our review thus far of the MPD's policies and procedures that are contained in the Departmental Orders (DO) manual,[1] selected Standard Operating Procedures (SOPs),[2] and our observations of officers in the field. This letter is therefore preliminary in nature and does not reach any conclusion about whether there is a violation of Section 14141.

The issues identified below focus on the following areas: use of force and use of force reporting, vehicle pursuit driving policy, search and seizure, complaints and investigations, early warning system, training, and structure of the DO manual generally. Please note that we may identify additional issues as our investigation progresses. We would also be happy to provide examples of policies used by other police departments that might address some of the issues we raise below, as well as to review additional policy revisions the MPD makes.

---

[1]     We reviewed the March 2002 version of the DOs, and the December 2002 version of the Taser DO. We have requested but have not yet received the most current versions of DO 9.13 (Juvenile/Missing Persons detail) and DO 12.10 (untitled) which we understand were recently revised.

[2]     We reviewed the following SOPs: Internal Affairs, Canine, Special Threat Response Team, Tactical and General Investigations, Violent Crime Intervention Unit, Homicide, and Inspections. We have not yet finished reviewing the Patrol SOPs, which we received on December 17, 2002.

-3-

## I.  Use of Force Policies

A.   Definition of use of force and use of force continuum

The MPD is not consistent in its definition of appropriate use of force.  Departmental Order 2.6.4.1 (Use of Force, Procedures) appropriately limits use of force to those situations where force is reasonably necessary.  However, in other places in the DOs the definition of use of force does not meet constitutional requirements.  For example, DO 1.11.6.5.2 (Arrests, Unnecessary Force) states that "members shall not use unnecessary force" in making an arrest.  Similarly, DO 1.11.6.5.3 (Degree of Force to be Used in Making an Arrest) states that officers will be justified in using force if "they fulfill their duty in a consistent, careful, and prudent manner."  In addition, the Internal Affairs SOP governing the duties and responsibilities of members refers to a "flagrant use of excessive force" as the standard for review of excessive force incidents by Internal Affairs.  Finally, DO 2.6.4.2 (Situations Requiring A Control of Persons Report) could be read as excluding uses of force from its definition, such as pain compliance holds and takedowns, that should be included.  We recommend that the MPD review all of its DOs and SOPs for consistency on the standard for acceptable uses of force.

The MPD also fails to provide officers with clear guidance on what constitutes a reasonable use of force.  The main use of force policy, DO 2.6, does not contain a use of force continuum, matrix or any description of levels of resistance and appropriate responses, and does not address de-escalation techniques.  The DO on Using Force, DO 2.6.4.1, refers to a use of force matrix card given to officers at training, and at the officer survival training we observed in September 2002, MPD trainers referred to a document entitled "Recommended Use of Force/Levels of Resistance Matrix" as its use of force matrix.  However, as our consultants advised Chief Martinez and Chief Timoney, the matrix we saw at survival training is outdated, and does not include some of the specific types of force MPD officers use, such as canines and Tasers.  Lack of specific guidance may lead officers to believe they are justified in using force in situations in which it would be unreasonable or unnecessary.

When properly designed and implemented, a use of force continuum is a fluid and flexible policy guide.  Many major city police departments employ a use of force continuum because it provides a useful tool in training officers to consider lower levels of force first, which protects the safety of both the officer and the civilian.  Moreover, a use of force continuum

-4-

emphasizes that officers' presence, verbal commands, and use of "soft hands" techniques (using hands to escort rather than control subjects) can often be used as an alternative to other more significant uses of force.

We recommend that the MPD create a DO governing use of force that includes a use of force continuum.  The continuum should include the actual types of force instruments used by the MPD, including canines and Tasers.  We suggest that the continuum clearly indicate which response is appropriate for which type of resistance encountered.

B.    Canines

The MPD's canine policy, DO 12.6, fails to identify the MPD's canine handling methodology, and does not define important elements of canine use.  The MPD does not specify whether it uses a "find and bite" policy (which allows dogs to bite upon locating a subject) or a "find and bark" policy (requiring a dog to bark, rather than bite).  Based on our discussions with canine unit command staff, supervisors, and officers it appears that the MPD actually uses a "find and bite" policy because the dog is trained, when off leash, to bite when it encounters a subject, regardless of whether the subject is actively resisting or attempting to flee.  Based on our discussion with canine unit officers, we understand that most newly acquired canines arrive at the MPD trained to alert rather than bite in most circumstances, and that the MPD retrains the dogs to bite.

A "find and bark" policy prevents canines from biting subjects in situations in which such force is not necessary to effect an arrest or protect the safety of officers or civilians, such as where a subject is passively hiding in a building.  We understand from our meetings with Chief Martinez and Chief Timoney that the MPD continues to evaluate "find and bark" as compared to "find and bite" policies.  We look forward to learning the MPD's conclusions.  We recommend that the MPD explicitly adopt a "find and bark" policy.

The MPD's policy provides in DO 12.6.4.6.2 (Prohibited Canine Usages) that canines are not to be used to "intimidate or frighten a suspect." Despite the prohibition on using canines for intimidation, DO 12.6.4.3.4 (Crowd Control) permits the use of canines "[o]n approval by the Chief of Police, when specifically requested at any event where very large crowds are anticipated" to serve as a "high visibility deterrent." We believe that the MPD's anti-intimidation policy and the crowd control policy as implemented in the above example are contradictory.  We recommend

-5-

that the MPD prohibit the use of canines as a deterrent to protect property only, and that the MPD authorize the use of canines for crowd control only during riots, potential riot conditions, or other large unauthorized assemblies where there is a reasonable likelihood that injury to officers or others could occur, and where crowds cannot be controlled by any other means.[1]

We found several instances where the canine SOPs contain important policy directives that we believe also belong in the general DOs. We also found instances where the policy stated in the canine SOPs was inconsistent with the statement of policy in the DOs. All officers, not just canine officers, should learn the MPD's policies governing the use of force with respect to canines, since patrol officers are almost always present when canines are deployed. In general, we recommend, for all units, that all important policies contained in the SOPs be included in the DOs as well, and that they be consistent with each other (see section VIII, Structure and organization of Departmental Orders, below).

As the first example, canine SOP 5 specifies that canines may be used, with permission of a commanding officer, to "search for an offender of any crime whereby the offender is armed or has armed himself with a weapon or firearm during the commission of a crime." However, the canine policy, DO 12.6, permits canines to be used "where an offender or offenders are believed to be a threat," and does not further limit the use of canines other than to prohibit them from being used to apprehend traffic violators and shoplifters. The DO fails to provide guidance to an officer about what constitutes a "threat," and therefore could lead to officers to use canines in situations where their use could constitute excessive force. We recommend that the MPD clearly state the limits of when a canine can be used in the Departmental Orders as well as in the SOPs, and ensure that the policies conform with each other.

A second example concerns verbal warnings. The canine DO does not require verbal warnings before releasing a canine. However, canine SOP 5 requires an officer searching a building to give one warning identifying himself or herself as a police officer, announcing that police dogs are present and will be

---

[1]     We learned that the MPD routinely used canines as crowd control at football stadiums as a means of deterring citizens from damaging the goal posts. We understand that Chief Martinez directed that canines no longer be used at football games. This change is consistent with our recommendation.

- 6 -

released, and demanding that the subject surrender. There is no requirement, in either the DO or the SOPs, that officers warn that the dog will bite. We recommend that the DO 12.6 require, absent exigent circumstances, a set number of announcements that a canine will be deployed, and a sufficient interval between announcement and deployment to allow for subject surrender, when a canine is used to search a building. We also recommend that the warnings be repeated on each floor of a building, and that patrol officers be trained and authorized to give warnings when they are responsible for maintaining perimeters. Finally, in all situations where a warning is given, the warnings should state clearly that the dog will bite.

Moreover, the SOP appears to require the full warning in English only, requiring only "Policia Salga" ("Police - come out") and "Police. Soti" (sic) ("Police - leave") as a warning in Spanish and Creole, respectively. Officers and command staff confirmed that the full warning was not given in Spanish or Creole. Failure to require multiple and complete warnings in a language that the subject can understand can result in excessive force being used, because it eliminates the opportunity for a subject to surrender before getting bitten. We recommended to Chief Martinez in September that the MPD give warnings in all three languages, and learned the next day that the MPD had already started developing these warnings. We commend the MPD for its quick response.

A third example concerns the MPD's policies governing recall of a canine. Canine DO 12.6 does not provide guidance on how and under what circumstances an officer must recall a dog after deployment, although we did learn from talking to officers that it is the MPD's practice to recall the dog as soon as the subject surrenders. The governing SOP, however, mandates recall if the officer loses sight of an off leash canine, but does not specifically require the officer to recall the dog once the subject has stopped resisting. This could lead to the use of excessive force if the canine continues to bite once the subject has stopped resisting or trying to flee. We recommend the DO be rewritten to resolve the discrepancy between the SOP and the practice regarding recalls, and to include specific guidance on recalling the canine.

Fourth, DO 12.6 does not clearly define a canine apprehension. However, the SOP governing the duties and responsibilities of canine handlers appears to count as a canine apprehension any time a subject: (a) is physically captured or located by the canine team; (b) surrenders because of the canine deployment; or (c) is arrested because of the presence and

- 7 -

deterrence of the canine. We believe the standards articulated under (b) and (c) are vague, and could allow canine officers to count as a canine apprehension situations where the canine had only a peripheral role. This, in turn, could artificially lower the canine bite ratio by comparing the number of bites to a larger number of "apprehensions" than can legitimately be counted as such. We recommend as a more appropriate standard that an apprehension be defined as any time the canine is deployed and plays a clear and well-documented role in the capture of a person. Similarly, DO 12.6 does not define a canine deployment. We recommend that a canine deployment be defined as an active search where the canine has an assigned task and is actually used in the search. The mere presence of the canine at the scene should not count toward either a deployment or an apprehension.

We understand that all supervisors do not receive formal standardized training in canine handling procedures. Such training should be provided not only to supervisors in the canine unit, but to all supervisors, because both the DOs and SOPs allow supervisors not assigned to the canine unit to supervise canine handlers in some situations. In addition, although neither the DOs nor the SOPs address the role of patrol officers in providing field support to canine handlers while on active deployment, we understand that patrol officers perform such duties. However, we learned that patrol officers are not adequately trained to assist the canine officers. We learned that patrol officers have broken the perimeter in which the canine is working, which can lead to the canine's confusing the officer's scent with the scent of the person he is tracking, and may also put the patrol officer at risk for bites if he or she follows the natural inclination to watch the canine instead of look for the subject. We recommend that patrol officers, as well as supervisors, be trained in back-up support for canine handlers.

Neither the MPD's canine policy nor its SOPs require supervisory review of incidents involving canine deployment or canine apprehensions, although presumably there is some supervisory review of apprehensions in order for the MPD to compile statistics for purposes of calculating its canine bite ratios. Canine bites are reviewed by a supervisor (not necessarily a canine supervisor), but there is no requirement that supervisors review canine deployments. We recommend that all canine deployments and apprehensions be reviewed by a supervisor.

- 8 -

We learned that the canine sergeant and the Commander of the
Field Support Section review bite ratios, but only on officers
with a bite ratio higher than 30%. We believe that a 30% bite
ratio is a high standard, and that a threshold of 20% and above
should begin to raise concerns. We recommend that officers whose
bite ratios exceed 20% be subject to higher scrutiny. Many major
police departments scrutinize bite ratios over 20% and the MPD
should consider adopting lower thresholds. Moreover, the MPD's
actual bite ratio may be higher than its numbers indicate given
the possibility, as noted above, that the MPD may be using an
over-inclusive definition of canine apprehensions.

Finally, the MPD does not appear to have a policy governing
canine searches for known juveniles, such as in school buildings.
For several reasons, including the fact that the damage resulting
from a canine bite can be much more severe on a juvenile than on
an adult, the fact that juveniles may not be able to follow the
directions of the canine officers to avoid being bitten, and
because of additional legal safeguards that may be involved in
protecting the rights of minors, we recommend that the MPD
develop such a policy.

C.    Firearms

Although DO 2.7 (Firearms Procedures) requires officers to
qualify every year with every kind of firearm the MPD allows them
to use, we learned from command staff and officers that the MPD
does not enforce this requirement. We learned that, in practice,
officers can remain qualified for up to eighteen months to two
years before having to requalify. We recommend that officers
qualify to use each and every type of firearm the MPD allows them
to carry at least once a year.

The Firearms Procedures policy permits officers to carry
personal carbines at work, although it does caution that a
carbine is a "secondary firearm to the Glock pistol and should
not be routinely deployed in most situations," DO 2.7.5.3
(Approval of personally owned carbines for on-duty use). The MPD
should reconsider authorizing the use of personal carbines. This
recommendation is based on the fact that carbines, which are
high-velocity military rifles, can be altered easily, and can
also fire many different kinds of projectiles. Moreover, the
City of Miami includes many densely-populated areas where highly-
penetrating bullets may hit unintended targets. Prohibiting the
use of carbines would allow the MPD more control over both the
types of weapons, and the ammunition, that MPD officers use. At
a minimum, we recommend that the MPD research and test carbines
and all other weapons which make up its current arsenal to

-9-

determine the risk levels associated with such weapons, and the appropriateness of their use given the City's urban characteristics.  We recommend that the MPD revise its firearms policy to allow officers to carry only those specified weapons and cartridges that have been department-approved for urban community use.

Under DO 1.11.6.17 (Rules and Regulations, Disciplinary Action, General Offenses), "unjustified" or "careless" use of a firearm is listed as a general offense for disciplinary action. DO 1.11.6.17.29.  However, the DO does not further define these terms.  We recommend that this policy be clarified to include examples of "unjustified" or "careless" use of a firearm.  The examples should include, among other things, unintentional discharges of the officer's weapon when engaged in inappropriate behavior, such as playing with one's weapon, and engaging in pranks involving the weapon.

D.    Tasers

Following a six month feasibility study, the MPD has decided to add the M-26 Taser to its arsenal of weapons.  We have given the MPD feedback on the Taser program during the consideration phase, and repeat here our concerns and recommendations for strengthening the Taser policy.[4]

The Taser temporarily incapacitates a subject by administering a low amperage, high voltage electric shock that causes an instant loss of neuromuscular control.  The Taser should be regarded as an addition, not an alternative, to OC spray.  The MPD currently requires that only those officers who are appropriately trained and certified in the use of the Taser be allowed to carry it.  We recommend that the MPD continue this requirement.

The Taser policy does not refer to the Taser's position on a use of force continuum, although incapacitating techniques, which presumably would include the Taser, are included on the "Recommended Use of Force/Levels of Resistance Matrix" just below deadly force.  As we noted earlier, we recommend that the MPD replace this matrix with an updated use of force continuum, and that the Taser be included on the continuum.  In addition, we recommend that the MPD change the Taser policy as well to clearly indicate where the Taser falls on the new continuum.

---

[4]    We reviewed the MPD's Taser policy dated March 2002, and the revised policy dated December 2002.

- 10 -

The Taser policy classifies the Taser as a "less-than lethal weapon," DO 2.15.3. The manufacturer uses the description "less lethal." Given that there have been reports of deaths after Taser deployment that could not be readily explained by another cause, such as drug intoxication, changing the description to "less lethal" would emphasize to MPD officers that the Taser is a serious use of force. We therefore recommend that the MPD use the manufacturer's description of "less lethal."

The Taser policy specifies in DO 2.15.3.2 that "[e]xcessive or brutal use of the M-26 Taser in subduing a subject is forbidden." However, the policy does not define or give examples of these terms. The manufacturer lists situations in which the Taser should not be used because the potential danger of using it outweighs the potential benefits. Accordingly, we recommend that, at a minimum, the MPD not permit the Taser to be used in any situation where the manufacturer recommends against its use. For example, we recommend that the MPD adhere to the manufacturer's recommendation that Taser probes not be fired intentionally into a subject's face, by stating so in its policy.

Similarly, the manufacturer's written materials specify that the use of the Taser on a person who has been sprayed with Saber Red (the chemical irritant the MPD uses) could cause that person to catch on fire. Accordingly, the Taser policy should prohibit officers from using the Taser on subjects who have been recently sprayed with Saber Red. We understand that the MPD is considering rewriting its policy to prohibit use of the Taser on a person who has been sprayed with Saber Red.

The Taser policy states that "the subject will...be forewarned that the Taser will be utilized for failure to comply with verbal commands." DO 2.15.4.6.1. However, more detailed multiple warnings that the Taser is about to be fired, and that an electrical shock will be administered unless the subject complies, may result in compliance without resorting to the actual use of the Taser. Absent exigent circumstances, we recommend that, before firing the Taser, the MPD issue warnings similar to those we have recommended be given before releasing canines.

In October 2002, Chief Martinez informed us that the MPD will allow officers who have been issued Tasers to carry them in their duty belts. We recommend that the MPD monitor this decision and make appropriate adjustments in the future if needed, such as requiring officers to carry Tasers in their cars, in light of the similarity in size and shape between Tasers and the service weapon.

- 11 -

We learned that the MPD does not photograph the Taser probes where they attach to a person's body after an officer deploys a Taser.  A photographic record protects the officer in case a dispute arises later, and also tracks the accuracy of the Taser and the officers firing them.  We recommend that, where practicable, the MPD photograph the location(s) where the probe(s) hit, both before and after the probes are removed. These photographs, along with the computer printouts from the fired Taser, should be part of the investigation done by a supervisor on every Taser discharge.

Although DO 2.15.4.3.5 requires Taser probes to be removed by Fire Rescue personnel, we understand the MPD is considering a change in policy to allow officers to remove the probes.[5]  We believe, to protect the officer both from liability in case the subject is injured by removal of the probes, and from possible infection from body fluids, that probes should be removed from a person's body only by medical personnel.

The Taser policy in DO 2.15.4.5 also requires supervisors to periodically inspect each officer's Taser and determine the number of times it has been deployed since the last inspection. As a further safeguard, a fixed time period should be established for regular supervisor inspections of all Tasers.  Additionally, consideration should be given to having the Inspections Unit conduct random inspections of the Taser and random audits of the supervisors' inspections.

Finally, the Taser policy does not require supervisors to investigate a Taser deployment as a use of force where the Taser is the only force used.  We recommend that this policy be changed to require that supervisors be required to investigate all Taser deployments as uses of force.

## II.   Use of Force Reporting

The MPD uses a different form for reporting each type of force officers use (e.g., Taser, Canine, O.C. spray, and Control of Persons (use of physical force)).  A single form for reporting all uses of force would aid the MPD in investigating and reviewing uses of force, and allow the MPD to track and evaluate uses of force more accurately and thoroughly.  We recommend that

---

[5]      Memorandum from Kathleen Schrank, MD, Miami Fire Rescue EMS Medical Director, to Sgt. Richard Gentry, dated July 28, 2002, recommending that the MPD train its officers to remove probes on scenes of most incidents.

- 12 -

the MPD develop a single uniform use of force report that identifies each type of force that was used, and requires the evaluation of each use of force.  The MPD has given us a working draft of a uniform use of force reporting form.  We look forward to seeing the completed product and renew our offer to review it before it is implemented.

We are also concerned that the MPD's policies on reporting use of force are likely to lead to an under-reporting of the use of force.  For example, according to DO 2.6.4.7 (Drawing Firearms), the MPD does not require officers to report instances when they draw and point a firearm at, or in the direction of, another person, but do not shoot.  This kind of use of a firearm, as opposed to merely unholstering a weapon, should be reported and evaluated as a means of obtaining important risk management information.

With respect to reporting firearms discharges, DO 1.11.6.21.3, Discharge of Firearms Restrictions, Report of Use, requires officers to make a verbal report "as soon as circumstances will permit," and to file a written report "as soon as practical thereafter."  We have learned from command staff and officers that, after a discharge of firearm event, officers sometimes avoid talking to any supervisor at all until days after the event.  We believe that the lapses in time that DO 1.11.6.21.3 permits could seriously undermine investigators' efforts to gather facts and evidence about police-involved shootings fully and quickly, such as witness information, information about the geographical boundaries of the event, and available evidence.  We recommend that the MPD require officers to notify their supervisors immediately after any gun discharge incident, and also require officers to complete a brief written report no later than the end of the officer's or supervisor's tour of duty.

We also discovered weaknesses in the policy governing the supervisor's role in investigating uses of force.  As currently written, DO 2.6.4.4.5, which governs when a supervisor's narrative is required on a Control of Persons report, requires sergeants to investigate uses of force "under normal circumstances."  We believe this standard does not give sergeants adequate guidance in determining when a report must be written. We recommend that the policy be rewritten to require that supervisors investigate each use of force, with the exception of those under review by Internal Affairs and Homicide.  We recommend that the MPD amend its use of force reporting policy to require that all uses of force beyond verbal commands and "soft hands" be reported.

- 13 -

Finally, current MPD policy does not require injury to prisoner reports to be written in all circumstances, but only where an officer uses force and "there is a complaint of injury and the injury is visible," DO 2.6.4.3.  This can lead to under-reporting of uses of force, and therefore we recommend that officers write reports whenever there is a complaint of an injury to a prisoner, whether incurred before or during the police encounter, and regardless of the severity of the injury or whether the injury is visible.

We have also learned of deficiencies in procedures governing the tracking of Control of Persons (use of force) reports.  Internal Affairs is charged with investigating all Control of Persons reports.  However, we learned that some Control of Persons reports were not getting forwarded to Internal Affairs.  While supervisors were logging in Control of Persons incidents, there was no follow-up to make sure that relevant reports were actually forwarded to Internal Affairs.  We learned the MPD has instituted a new policy requiring sergeants to log the incident to maintain the chain of custody of the reports.  Internal Affairs then collects the logs and tracks whether all relevant Control of Persons reports are being forwarded, and which ones they have not received.  We support this change.

### III.  Vehicle Pursuit Driving Policy

The Vehicle Pursuit Driving policy in DO 11.7.4.6 permits roadblocks.  Most cities do not allow roadblocks, but rather use tire-puncturing devices, because cars hitting roadblocks can and do result often in fatalities.  We recommend that the MPD prohibit roadblocks for this reason.

The DO's language on limiting pursuits in bad weather is good, but should be expanded to include other factors that can effect the dangerousness of a pursuit, like time of day, proximity to a school zone, number of pedestrians, traffic volume, etc.  Similarly, the requirement to cut off pursuit when an officer thinks there is clear and unreasonable danger is too vague and fails to provide adequate guidance about what constitutes a danger.  We recommend that the MPD follow the trend in most police departments by setting a reasonable restriction on the speed for continuing a vehicle pursuit, and add this specific limitation to the DO.

The MPD does not have a foot pursuit policy.  To protect the safety of officers and citizens, the MPD should develop and adopt a foot pursuit policy.  The policy should require officers to consider particular factors in determining whether a foot pursuit

- 14 -

is appropriate.  These factors should include, inter alia, the
alleged offense committed by the subject, whether the subject is
armed, the location (i.e., lighting, officer familiarity), and
the ability to apprehend the subject at a later date.  The policy
should also include alternatives to foot pursuits, including area
containment, surveillance, and obtaining reinforcements.  A foot
pursuit policy should be made a discrete and separate DO.

### IV.  Search and Seizure

We did not find, either in the DOs or the SOPs, a policy or
procedure governing the permissible circumstances under which
officers can detain a person on a street stop.  Indeed, we
observed officers making coercive stops in crime suppression
sweeps without it being clear to us that those stops were based
on reasonable suspicion that a crime had been or was about to be
committed.  The absence of a clear policy limiting officers'
discretion in effecting street stops increases the chances that
officers will go beyond the legal bounds of reasonable suspicion.
Accordingly, we recommend that the MPD create a policy on street
stops.

The DOs currently do not require a supervisor to review
officers' arrest reports.  We recommend that supervisors review
all arrest reports, with particular emphasis on charges of
resisting arrest, interference with official duty, and assault on
a police officer.  This is a valuable tool to deter use of
excessive force by officers, and to spot problems with
sufficiency of probable cause.

### V.  External Complaints

According to MPD policy, the Internal Affairs Section has
the primary authority for accepting, coordinating, and tracking
the investigation of external complaints.  The DO manual,
however, does not specify whether there is any external entity
that oversees Internal Affairs investigations.  Based on our
interviews, we have learned that the Office of Professional
Compliance (OPC), currently a unit under the Office of the City
Manager, reviews a limited number of closed Internal Affairs
investigations involving·excessive force, abusiveness, and
discharges of firearms for purpose of reviewing the adequacy of
the investigation.  The OPC can make recommendations to Internal
Affairs to reopen an investigation, but we learned from our
interviews that that rarely happens.  Internal Affairs has the
final say on whether an investigation stays closed or is re-
opened.

- 15 -

The Civilian Investigative Panel (CIP), approved by Miami voters in November 2001, will apparently have the authority to oversee Internal Affairs investigations and to subpoena witnesses under the direction of the State Attorney's Office.[4]  An adequate external complaint process is a crucial oversight mechanism and an important deterrent of misconduct.

A.   <u>Publicity of the citizen complaint process</u>

It is equally important that the public have access to information regarding the citizen complaint process, and that there be public trust in the integrity of the process.  The policies do not address how the MPD provides information to citizens about its complaint process.  In response to our document request, however, the MPD provided an information sheet titled "City of Miami Police Department:  The Complaint Investigation Process."  This sheet describes the complaint process, provides contact information, and outlines five possible complaint dispositions.

Our interviews with community group leaders revealed sentiments that the MPD's citizen complaint process is generally unknown or believed to be ineffective, and that materials describing the complaint process are not generally available.  In particular, the City's Community Relations Board was unaware of materials that outlined the MPD's citizen complaint process.

We recommend that the MPD better disseminate information to the public about the citizen complaint process and ensure that effective communication with community groups takes place in order to foster greater confidence in the process.  We recommend that each Neighborhood Enhancement Team (NET) station have information about the complaint process posted in a visible place in the public reception area.  Each officer while on duty should also carry informative materials in their vehicles to be made available to members of the public that they come in contact with upon their request.  In addition, this information should be readily available in City buildings, such as City Hall, and to various community groups throughout the City.  Finally, the MPD should consider posting this information on-line in addition to the MPD Citizen Complaint telephone number that the City's website currently provides.

---

[4]   We understand that, as of January 24, 2003, nine of the thirteen members of the CIP had been selected.

- 16 -

We understand the MPD plans to transfer the Internal Affairs Section to a location outside of Headquarters.  We support this decision.  We look forward to this and other improvements to the complaint process, including the efforts the MPD is currently making to solicit citizen feedback through the recently modified Satisfaction Survey it distributed.

B.   Intake and tracking of external complaints

We have learned of several MPD policies and practices that appear to discourage the filing of complaints.  For example, the Internal Affairs SOP governing the duties and responsibilities of the Unit Commander in reviewing Control of Persons reports requires an Internal Affairs investigation to be opened when, among other criteria, the "arrestee <u>insists</u> on filing a complaint" (emphasis added).  This language suggests that an arrestee might expect to meet resistance from the MPD in filing a complaint.  In addition, while DO 1.11.6.17.26 cites the refusal to give one's name, I.B.M. number, or to display one's identification card when requested as grounds for discipline, the MPD does not have a policy requiring officers to visibly display their name when interacting with the public.  Difficulty in identifying the officer a person wishes to complain about could discourage the filing of complaints.  In addition, some persons reported that they were not interviewed when they appeared in person to make a complaint, and others who were interviewed reported that the MPD reportedly engages in questioning techniques that are aimed more at discrediting the complainant rather than fact-finding.  Finally, we understand that the MPD does not accept anonymous or third party complaints.

Under current MPD policy (Internal Affairs Section, Responsibilities, DO 2.1.3), Internal Affairs is responsible for accepting complaints against department employees regarding allegations of misconduct or unlawful activity.  According to DO 2.2.4.3.1 (Internal Investigations, Procedures), Internal Affairs assigns complaints involving "harassment, improper demeanor, and minor infractions, such as discourtesy" to the unit commander or designee.  According to Internal Affairs SOP 5, Internal Affairs retains for investigation all complaints involving corruption, criminal activity, misconduct, excessive force, abusive treatment, employee substance abuse, and sexual harassment.  The policy requiring that certain types of complaints be handled by the unit commanders or designees also requires that unit commanders or their designee ensure that a "complete and expeditious investigation" takes place (DO 2.2.4.3.1).  However, according to officers we have talked to, this process has resulted in delays in resolving complaints.

- 17 -

The policies are also unclear about the responsibility of all MPD employees to accept citizen complaints. While DC 2.2.3 (Internal Investigations, Responsibilities) states that "each member of the Department shall perform the duties and assume the obligations of their rank in the reporting and investigation of complaints or allegations of misconduct against members of the Department," it does not describe what the role of each member is to accept and process citizen complaints.

With respect to tracking of complaints, we noticed in our review of the Internal Affairs SOP 6 that there is a category of findings after investigation of complaints called "Information," where "the complaint alleged has been filed but cannot proceed. Case can be reopened at a future date when new or additional information is received." We understand that complaints against officers where the complainant does not pursue the complaint fall into this category. Further, we understand that the OPC does not independently track the complaints it receives. Instead, when a citizen calls the OPC to make a complaint against a member of the MPD, the OPC takes the complainant's information and forwards it to the Internal Affairs Section.

We recommend that the MPD review its policies and procedures and rewrite those policies that could tend to discourage filing of citizen complaints. The MPD should change the aspects of its citizen complaint process that have the potential to discourage the filing of complaints or to limit the kinds of complaints accepted or the sources from which complaints will be accepted. The MPD should adopt a policy that explicitly prohibits any conduct that would tend to discourage a citizen from making a complaint, and discipline officers for violating the policy. We also recommend that the MPD write a specific Departmental Order clarifying all employees' roles in accepting and investigating complaints.

We further recommend that all complaints against officers be investigated to the extent possible, regardless of the source of the complaint or the reluctance of the complainant. We also recommend that the MPD accept and investigate to the extent possible anonymous and third party complaints to address those situations where complainant may have legitimate reasons for not wanting to come forward personally.

- 18 -

In our meeting with Internal Affairs in November 2002, we learned that the MPD was in the process of computerizing the complaint process so that complaints can be tracked and resolved more efficiently.  We commend the MPD for this measure, look forward to seeing it implemented, and also recommend that the City ensure that adequate tracking of complaints received by agencies outside the MPD occurs.

## VI.  Early Warning System (EWS)

Through our discussions with command staff and officers, it is clear that the MPD recognizes that its EWS needs to be improved, and we understand that significant changes to the EWS are contemplated.  We learned that the MPD is considering a change in the combination of triggers to allow the EWS to identify an officer who has five incidents in any combination of the four categories over two years, and is also considering lowering the number of firearms discharges as well.  We also learned that the MPD has hired an intelligence specialist to assist in the development of information management for the new EWS.  We believe these are positive developments.

As we previously discussed with Chief Martinez in our exit interviews, we discovered several weaknesses in DO 2.8 governing the Early Warning System (EWS).  According to DO 2.8 and the Internal Affairs SOPs as currently written, the EWS identifies officers when they have five complaints of the same type in two years' in any one of four categories:  substantiated or inconclusive complaints; Control of Persons incidents; reprimands; and firearms discharges.  Accordingly, an officer could conceivably have four incidents in each category for the two-year period and not trigger the early warning system.

We believe that the types of incidents that trigger the MPD's EWS are too narrow, and that the time period is too short to give supervisors valuable information that, if received early, could identify potential problem officers before misconduct actually develops.  For this reason, we encourage the MPD to continue refining the EWS to include capturing all significant behavior issues, violations of policies and laws, and liability issues, and should also consider lengthening the two year time period.  For example, in our meetings with MPD staff we have

-------------------

The exception is canine bites, which trigger the EWS if an officer has five bites or more in one year, and firearms discharges, which trigger the EWS if an officer has three discharges within five years.

- 19 -

suggested including personnel information, civil lawsuits, vehicle pursuits, and arrest patterns, among other things, as examples of appropriate categories for an early warning systems. The MPD should also consider linking its databases, including the personnel and arrest databases, so that all information that could be useful to supervisors in detecting an early pattern of potentially problematic behavior is easily available.

We recommend that the MPD train all supervisors on the new EWS, including training on how to address trends spotted with officers, and create more informal ways of addressing the trends spotted than the list of options contained in DO 2.8.4.3.3 (Early Warning System, Recommendation), which could appear punitive to both officers and supervisors.  Optimally, the information obtained through supervisory review of an officer's conduct should result, where appropriate and necessary, in non-disciplinary intervention, which could include discussion, counseling, training, and action plans designed to improve performance.

## VII.  Training

In general, training at the MPD is decentralized, with many of the units, such as Field Training Officers (FTOs), canine, marine patrol, and SWAT doing their own training without the input or oversight of the training division.  There is also no link between academy training and FTO training.  In addition, we learned that, often, roll-call training is done without the input of the training division, and that command staff does not audit training.  According to DO 6.9.4.16, the Training Committee, the role of which is to assist in developing training for the MPD, meets only on an "as needed" basis, and includes only upper management and representatives from the law department and the FOP.

Centralized, coordinated training would allow for more consistency and allow officers' progress to be tracked more closely as they move through the ranks and through the different units.  We recommend that training be approved by and coordinated through the training division.  We recommend that the Training Committee be expanded to include representatives from all levels of the organization, and that command staff audit training periodically, with the monitoring effort being distributed throughout command levels.  These measures will address concerns that MPD management is not sufficiently cognizant of what occurs in officer training.

- 20 -

While the officer survival training we attended in September was for the most part very well done, we did have some specific concerns. First, as we mentioned previously, the use of force matrix the MPD uses is outdated and is not tailored to the specific types of force MPD officers are authorized to use. Officers should be taught de-escalation and regrouping techniques in addition to tactics, to encourage them to assess every situation to determine if continued action on their part is the most advisable course. In addition, we observed during survival training some deficiencies in how officers were being trained on the new deadly force policy. For example, we witnessed a situation in which officers suggested that they need not follow the new policy, and were not corrected by the training staff. We also observed that training staff emphasized that the decision to use deadly force was dependent on the officer's perception of an immediate threat, without concurrently emphasizing that the perception must be objectively reasonable. Our recommendations for improving survival training include: greater emphasis on the requirement that the decision to use deadly force must be objectively reasonable; more forceful response from trainers to inappropriate or inaccurate comments from training participants on the meaning of the new policy; and increased emphasis on the current state of the law on officers' use of deadly force.

Additionally, in our conversations with officers and supervisors, we learned of concerns about encounters with persons who have mental illness or are homeless. According to officers and supervisors we talked to, only about 70 officers have received crisis intervention training, and trained officers are not always available to respond when needed. We recommend that the MPD significantly increase the number of Crisis Intervention Team (CIT) officers.

Finally, we understand that a separate training for new sergeants, covering supervisory responsibilities, has been developed recently. Our recommendation is to include all current sergeants, in addition to new sergeants, in this training.

## VIII. Structure and Organization of Departmental Orders

In general, we found that while the DOs cover a comprehensive range of topics, they are poorly organized. For example, policies governing the use of force are found in several different places throughout the DOs: the main policy is in DO 2.6 (Use of Force), but important parts of the policy are found elsewhere, including in DO 1.11.6.21 (Firearms and Weapons), in

- 21 -

DO 1.11.6.5.2 (Arrests-Unnecessary Force), in DO 1.11.6.21.8 (Less Lethal Weapons), in DO 1.11.6.37.2 (Prisoners), and in DO 2.3.4.3 (Code of Ethics). Requiring officers to look up important policies in several different areas of the manual makes it less likely that officers will identify and learn the entire policy. In addition, some policies are not contained within the most relevant subject matter area. For example, DO 2.5 (Arrest Procedures) and DO 2.7 (Firearms Procedures) are placed under DO 2 (Internal Affairs) which covers the investigative process, rather than under DO 11 (Patrol) which covers field operations and procedures.

A well-organized and clearly-written policies and procedures manual allows officers to quickly find the parameters by which the entire organization operates. The ability to find a complete policy quickly is especially important for those policies that officers would be expected to refer to often, including use of force, incident reporting, and arrest procedures. Currently, all of these policies are scattered throughout the DO manual. We recommend that the MPD reorganize the DOs so that an entire policy is found in one place.

In addition, the rules of conduct, which are the list of specific prohibitions that cannot be violated and the affirmative requirements that officers must follow, also are not contained within one area in the manual. We recommend that the MPD arrange the rules of conduct in a separate section of the DO manual, so that officers can quickly find and more easily familiarize themselves with the MPD's requirements for officer conduct.

A second area of concern with the DO manual is that use of force policies that appear to be no longer in effect remain in the manual. Currently, the Leg Restraint Policy, DO 2.13.5, states that "hogtying...is prohibited except as a last resort to restrain a subject." However, according to the officer survival training staff and other MPD personnel, hogtying is in fact no longer taught by the MPD, and training officers we talked to believe that the technique is no longer permitted. Increasingly, hogtying is being prohibited in police departments because it is a dangerous practice that puts prisoners at risk of death from positional asphyxia. Accordingly, we recommend that the MPD prohibit hogtying and remove references to hogtying from its policies. We make a similar recommendation with respect to the PR-24 baton, which is referred to in the DOs but which we understand has been replaced by the ASP (expandable) baton. In general, we recommend that the MPD thoroughly review the DOs for content, and remove any DOs that are no longer in effect.

- 22 -

Third, the MPD needs to ensure that each officer receives, reads, and understands the policies and procedures. Despite a requirement that officers carry a copy of the DOs in their cruiser, which we discovered in a line inspection report provided to us by the Inspections Unit, several officers reported having never seen the DOs. There is no formal mechanism that we are aware of to ensure that officers receive the manual or learn the policies. We learned that the MPD does not supply officers with a copy of the Patrol SOPs, and were told that officers familiarize themselves with the DOs only when they are due for promotion. Accordingly, we recommend that the MPD supply each officer with a copy of the DOs, provide training on their content if this is not already being done at the police academy, and conduct inspections to make sure that officers understand the policies, procedures and rules of conduct, including all policy updates and revisions. We have learned that the MPD plans to increase access to the DOs and SOPs by placing them on the computer system hard-drive, where they will be accessible to officers in each NET office and substation.

Fourth, many of the MPD's policies are not contained in the DOs, but are contained in the SOPs for the individual units. This results in important departmental policies being accessible only to officers who work in a particular unit. For example, the canine SOPs contain important information about warnings that must be given to suspects before a canine is released. Failure to give these warnings implicates the Fourth Amendment. It is therefore important for all officers, not just canine officers, to know the constitutional standards for issuing warnings before a canine is released, especially since patrol officers are responsible for maintaining the outer perimeter at canine deployments.

General orders, those that all officers in all divisions must follow, should be in the DOs. Any general order that appears in the SOPs should also contain a reference to where in the DOs the policy can be found. We recommend that the MPD undertake a complete review of all SOPs, and make sure that all policy directives, especially those governing use of force, are placed in the DOs as well as in the SOPs.

## IX.   Other Concerns

. From talking with command staff and officers, we learned that the Inspections Unit has focused almost exclusively in 2002 on the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) recertification. As a result, the Inspections Unit has not been performing the staff inspections it is required to

- 23 -

perform pursuant to the Departmental Order 1.5. According to reports we received from the MPD staff, random drug testing of officers has not been done for at least six months, and possibly one year, due to problems with the vendor laboratory. Our consultants recommended to the Chief on September 27, 2002 that the practice should be reinstated. In addition, our consultants recommended that drug testing be made mandatory for officers entering the narcotics unit.

We are concerned about the handcuffing procedures for misdemeanants outlined in DO 1.11.6.25.2, which allows officers to decide on a case-by-case basis whether they should handcuff a misdemeanor suspect. We recommend that all misdemeanant arrestees who are going to be transported be handcuffed, as a matter of officer safety.

       \*       \*       \*       \*

Please do not hesitate to contact us if you have any questions about the recommendations contained in this letter. We appreciate the cooperation we have received from City and MPD officials and look forward to working with you and the MPD in the coming months as our investigation proceeds.

Sincerely,

Steven H. Rosenbaum
Chief
Special Litigation Section

cc: Mr. George Wysong
Assistant City Attorney

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 01-208-CR-GOLD**

**UNITED STATES OF AMERICA,**

> **Plaintiff,**

v.                                           **[SEALED ORDER]**

**JOSE ACUNA, et. al.,**

> **Defendants.**

_____/

## ORDER ON RULE 801(d)(2)(E) STATEMENTS

## I. INTRODUCTION

This Court has admitted coconspirator hearsay subject to later proof that

a conspiracy did in fact exist. This procedure is  in accordance with *United*

*States v. James*, 590 F.2d 575 (5th Cir.)(en banc), cert. denied, 442 U.S. 917,

99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). The Court received the  Government's

initial proffer on Rule 801(d)(2)(E) statements. Thereafter, I received extensive

briefing and heard oral argument from the parties before permitting the

Government to introduce the statements during its case-in-chief. I have limited

the application of the statements to only certain of the defendants and have



advised the jury accordingly.

Pursuant to the *James* procedure, a determination is to be made at the close of the Government's case as to whether the prosecution has demonstrated by a preponderance of the evidence, independent of the hearsay itself, that the traditional requirements of admissibility have been met. As permitted by Rule 801(d)(2)(E), I have considered the content of the statements of the coconspirators in determining the existence of the conspiracy and the participation in it by the declarants. I have further considered the circumstances surrounding each statement, the context in which each statement was made, and the evidence corroborating the contents of each statement. Due to the complexity of the issues, I have elected to enter written findings and legal conclusions which will remain under seal until a jury verdict is rendered. For the reasons stated below, I find that the Government has met its burden by a preponderance of the evidence with respect to all the coconspirator statements and do hereby reaffirm their admission.

## II. RULE 801(d)(2)(E) STATEMENTS AT ISSUE.

### A. The I-395 Shooting.

The following Rule 801(d)(2)(E) statements were admitted against Defendants Beguiristain, Aguero, Gonzalez, Quintero, and Garcia (with the

2

exception of number 8 which was admitted only against Beguiristain):

1. Defendant Beguiristain's statement to Hames that "Pepe is coming."[1]

2. Defendant Beguiristain's statement to Hames that the color of the second gun was "blue."

3. Defendant Garcia's statement (according to Hames) at the barbecue restaurant "What are we going to say?"

4. Defendant Hames' statements at the barbecue restaurant to coordinate the shooters' stories.

5. Defendant Aguero's statement at the barbecue restaurant, "That is why they call him Bill Shakespeare."

6. Defendant Mervolion's testimony as to statements made by other defendants at or before the lunch meeting including: (a) Aguero's statements that all the shooters were meeting at the restaurant and his statement to Felix Delgado that he could not attend; (b) Defendant Gonzalez's statement that all the shooters had to be on the "same page" before giving their

---

[1]

Either Defendant Aguero or Garcia stated on the ramp after the shooting, "I have to go back to the station." This statement is admitted as a pre-conspiracy, intrinsically intertwined act to prove the nature and manner of operation of the conspiracy. The reasonable inference is that the speaker was going to go back to the station to obtain a throw down gun. See *United States v. Lehder-Rivas*, 955 F.2d 1510 (11th Cir.), cert. denied, 113 S.Ct. 347 (1986).

statements; (c) Hames' statements outlining the story that was to be told to homicide about the subjects having guns and pointing them at the officers before the shooting started, and (d) Beguiristain's statements to Mervolion several days after the lunch meeting that he recovered the gun around Young's body; that Young was still moving at the time; that Quintero brought the second gun to the scene to plant, and that Quintero previously was given the gun by Socorro who recognized it the night of the shooting.

7. The statements given under oath by Aguero, Garcia, Quintero,Beguiristain and Gonzalez [Government Exhibit Numbers A 24-34] that the two subjects had guns at the time of the shooting.

8. The intrinsic statement made by Beguiristain to Mervolion approximately two days prior to the I-395 shooting during a robbery. At that time, Beguiristain again rammed the subjects' vehicle who bailed out and ran away from the scene (similar to the I-395 incident). Beguiristain shot at one of the subjects, but missed. The subject was caught. Mervolion saw no gun, although Beguiristain charged the subject with strong-armed robbery. Beguiristain asked Mervolion if he had a gun [to plant] to justify the shooting. Mervolion said he did not keep one in the car. Beguiristain said that he had one, but he got rid of it a long time ago and that "... he can't even call any of the

4

guys from the C.S.T. Central or C.S.T. South because this was a Sunday that we were working. They were all off on that day." This statement was admitted only against Defendant Beguiristain. The jury was so instructed.[2]

9. The statement by Defendant Gonzalez to Mervolion after the I-395 shooting that he should not talk to anyone about it because they might be wearing a wire.

### B. The N.W.7th Court Shooting.

The following statements were admitted only against Defendants Beguiristain, Acuna, Macias, Fuentes, and Lopez: Government Exhibits B 6 through 12.

### C. The 43rd Street Shooting.

The following statements were admitted only against Defendants Aguero and Beguiristain:

1. Defendant Aguero's statement to John Mervolion at the time he gave Mervolion the .38 Rossi that no one was going to "mess" with his car and dog, and Aguero's request to Mervolion to hold the .38 Rossi until it is needed down the line.

---

[2]
The Court concludes that these statements constitute intrinsic evidence because they are inextricably intertwined and directly relate to the events set forth in the Superseding Indictment.

2. Defendant Beguiristain's statement to John Mervolion that Aguero  needed the gun, and Mervolion's response questioning whether Aguero was sure that he wanted to do it, and Aguero's silence to that question.

3. Aguero's statement to Mervolion that he not tell anyone about the gun recovered on 43rd Street because he cannot get linked to another gun.

4. Defendants Beguiristain and Aguero's sworn statements to Sergeant Raimondo Socorro regarding the 43rd Street shootings (as testified to by Socorro from his official Internal Affairs Report).

### D. The Coconut Grove Shooting.

The following statements were admitted only against Defendants Castello, Beguiristain, Acuna, and Aguero [except for Aguero's intrinsic statement to Officer Burt Bell requesting a sock which was admitted only against Aguero]:

1. Defendant Aguero's statement  to William Hames requesting that a gun be cleaned for fingerprints.

2. Defendant Aguero's statement to John Mervolion requesting that he stay where he was [blocking Major Rojas' view] so that Aguero could plant the gun.

3. The statements of Defendants Castello, Beguiristain, Acuna, and

6

Ronda which were entered as Government Exhibits D-29 through D-33.

## III. APPLICABLE LAW ON RULE 801(d)(2)(e) STATEMENTS.

Under Rule 801(d)(2)(E), statements of coconspirators made during the course and in furtherance of the conspiracy are not hearsay. In order for evidence to be admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) that the statement was made during the course and in furtherance of the conspiracy. *See United States v. Dickerson*, 248 F.3d 1036, 1049 (11th Cir. 2001)(citing *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)). When determining whether the above elements have been satisfied, the district court may rely on information provided by the coconspirator's proffered statements as well as independent external evidence. *See Bourjaily*, 483 U.S. at 180-81, 107 S.Ct. 2775; *United States v. Byrom*, 910 F.2d 725, 735-36 (11th Cir. 1990). The Eleventh Circuit applies "a liberal standard in determining whether a statement is made in furtherance of a conspiracy." *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988). The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way. *United States v.*

*Caraza*, 843 F.2d 432, 436 (11th Cir. 1988)(per curiam).

While the Eleventh Circuit has not addressed the issue directly, the Sixth Circuit, citing *Bourjaily,* has made it clear that the district court is not obligated to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E). In *United States v. Salgado,* 250 F.3d 438, 451 (6th Cir. 2000), the court stated, "Where it has been established by a preponderance of the evidence that a conspiracy existed, that the defendant was a member of the conspiracy, and that the statement was made in furtherance of the conspiracy, 'the Confrontation clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)' .[citing *Bourjaily,* 483 U.S. at 183-84, 107 S.Ct. 2775]. Once the statements are admitted, it is for the jury to determine what weight or credibility to assign each statement." Id.[3]

The Defendants have argued that the coconspirator statements at issue were not admissible under Rule 801(d)(2)(E) because each was made in furtherance of four independent conspiracies. In *United States v. Beale,* 921

---

[3]

While their has been considerable cross-examination at trial, and attacks on credibility relating to the testimony that constitutes the statements, the Court's inquiry is directed to whether there is some independent corroborating evidence beyond the coconspirator's statements showing each defendant's knowledge of and participation in the conspiracy as required under a *James* analysis.

F.2d 1412, 1423 (11th Cir. 1991), the Eleventh Circuit has recognized that there is case law to support the proposition that where there are multiple conspiracies, it is error to admit a statement which merely advances some other conspiracy not involving the defendant against whom it is admitted. Id. at 1423 (citing cases). Here, I have been conservative in limiting coconspirator statements to only the defendants who participated in each respective shooting and not against a defendant who did not participate in that shooting.

Notwithstanding, the determinative question is whether there was a single or multiple conspiracy for purposes of Rule 801(d)(2)(E) admission. Beale, 921 F.2d at 1423. The Eleventh Circuit has identified the following three factors to determine whether a conspiracy is a single or multiple: (1) the existence of a common goal; (2) the nature of the scheme; and, (3) the overlap of the participants. Id. (citing United States v. Caporale, 806 F.2d 1487, 1500 (11th Cir. 1986), cert. denied, 483 U.S. 1021 (1987)). See also United States v. Adam, 1 F.3d 1566, 1584 (11th Cir. 1993). Common, for purposes of this analysis, means "similar" or "substantially the same" rather than "shared" or "coordinate." Adams, 1 F.3d at 1584.

Applying these factors, the preponderance of the evidence, for Rule 801(d)(2)(E) purposes, supports the finding that the defendants were bound

9

together in a single conspiracy with overlapping participants. *United States v. LaSpesa*, 956 F.2d 1027 (overlap of one coconspirator *sufficient*); *United States v. Khoury*, 901 F.2d 948 (overlap of two sufficient); *United States v. Stitzer*, 785 F.2d 1506, 1518 (11th Cir.), cert. denied, 479 U.S. 823 (1986)(one distributor provided the common link between five separate "cluster" conspiracies); *United States v. Cole*, 755 F.2d 748 (11th Cir. 1985)(two common participants and one common supplier of marijuana).

Otherwise stated, the Government must prove the conspiracy it charged in the indictment rather than some other conspiracy. Here, the Government has met its burden by showing an "interdependence" among the alleged coconspirators in order to prove that the indicted conspiracy was a single unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies. *United States v. Toler*, 144 F.3d at 1426.

The overlapping participants included Defendants Beguiristain, Aguero, and Acuna. Beguiristain was a direct participant in all four incidents, and was involved in a "throw down" gun incident immediately before the I-395 Shooting. Defendant Aguero directly participated in three of the four incidents. Defendant Acuna participated in two of the incidents. He also participated with Aguero in the seizing and cleaning of the James Brown "throw down" gun. Defendant

10

Aguero further participated in the seizure of Carlos Diaz's "throw down" gun and the attempt to obtain another "throw down" gun from Officer Burt Bell before the Coconut Grove Shooting.

All the Defendants were bound together in a "mutually beneficial scheme." *LaSpesa*, 956 F.2d at 1031 ("In determining the existence of a single conspiracy, we examine three factors: (1) whether the coconspirators shared a common goal; (2) the nature of the scheme; and (3) the overlap of participants.... Applying this standard, the jury could easily find that the appellants were bound together in a 'mutually beneficial scheme.'")(citations omitted). The common goal was to cover for each other and to "clean up" or "cover up" a problematic shooting that occurred involving the defendants so that none of them would face repercussions. By the preponderance of the evidence, each shooting involved a subject (or in the case of I-395, two subjects) whom the shooting officers claimed was armed, but actually was not armed. The defendants all took steps to make it appear by their sworn testimony that the subjects were armed.

Each shooting was problematic. For instance, the I-395 Shooting involved subjects that were shot in the back; the N.W.7th Street Shooting involved an extraordinary number of shots at the victim, and the Coconut Grove

11

shooting involved a homeless man listening to a walkman. Each defendant in each shooting had an interest in the silence of the others so that all the shootings involving overlapping participants would not be further investigated for possible Federal civil rights violations.   The common scheme was to seize guns for use in later incidents, plant  throw down guns, and lie about the true facts to investigators and others after the fact. Each of the four shootings involved throw down guns by a preponderance of the evidence.   The defendants followed the same *modus operandi* for each shooting. Each shooting involved false testimony after the fact that was coordinated among the defendants.

The preponderance of the evidence establishes that each defendant was aware of the common illegal goal to cover up, and to give and coordinate false and misleading testimony, thereby demonstrating each defendant's intent to participate in achieving its illegal ends. As set forth below, this is established by virtue of their sworn statements and the supporting external evidence.  The preponderance of the evidence also supports that Defendants Beguiristain, Quintero, Acuna, and Aguero acted with premeditation to obtain guns to be ready for a throw down in the event of a problematic shooting.  The reasonable inference is that these defendants had a common plan in mind beforehand in

12

order to cover up a problematic shooting that might occur.  Other factors important here are that the defendants all knew and worked with each other on different occasions.  Also, it is significant to the single conspiracy that supervisory officers were involved, such as Defendants Gonzalez and Acuna who were Sergeants at the time.

In sum, the Government has shown an interdependence among the coconspirators to sufficiently prove by a preponderance of the evidence that there was a single unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies. While there are eleven defendants involved, each defendant's participation can be established even though his contact extends to only a few or even one of the coconspirators so long as the agreement, with its concomitant knowledge of the general scope and purpose of the conspiracy, is established, for Rule 801(d)(2)(E) purposes, by the preponderance of the evidence.

## IV. APPLICABLE LAW ON CONSPIRACY.

A conspiracy is an inchoate offense, the essence of which is to commit an unlawful act. *Iammelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975); *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998). The agreement is the "essential evil at which the crime of

13

conspiracy is directed," and "agreement remains the essential element of the crime." Id. at 777 n.10. The Eleventh Circuit case law has used a shorthand analytic template: a three-prong test which asks whether "(1) an agreement existed among two or more persons; (2) ... the defendant knew of the general purpose of the agreement; and (3) ... the defendant knowingly and voluntarily participated in the agreement." *Toler*, 144 F.3d at 1425. As further noted in *Toler*, "because the crime of conspiracy is "'predominantly mental in composition (citation omitted), it is frequently necessary to resort to circumstantial evidence to prove its elements." Id. at 1426. Thus, a common purpose and plan may be inferred from a "development and collocation of circumstances." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Gold*, 743 F.2d 800, 824 (11th Cir. 1984); *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998). Moreover, "a defendant's knowing participation in a conspiracy may be established through proof of surrounding circumstances, such as acts committed by the defendant which furthered the purpose of the conspiracy." *United States v. Vera*, 701 F.2d 1349, 1357 (11th

14

Cir. 1983). That is, a person's acts permit an inference of what he or she has agreed to do, and thus an agreement to form and participate in a conspiracy may be inferred from the performance of acts. *United States v. Mills*, 704 F.2d 1533 (11th Cir. 1983); *Toler*, 144 F.3d at 1426 ("...[t]he government need not demonstrate the existence of a 'formal agreement ...but may instead demonstrate by circumstantial evidence 'a meeting of the minds to commit an unlawful act.'") (citations omitted). But where the Government's case is based on circumstantial evidence, "reasonable inferences, and not mere speculation, must support the jury's verdict." *United States v. Perez-Tosta*, 36 F.3d 1552, 1557 (11th Cir. 1994). The same may be said for the Court's determination of compliance with Rule 801(d)(2)(E) requirements.

In the case of the I-395 Shooting, there was an initial conspiracy between Beguiristain and Quintero (who were not shooters) to help their fellow officers by planting "throw down guns." The shooters then held a meeting in which they reached an understanding to "get on the same page" about what they would say happened at the shooting. In the case of the remaining three shootings that followed, the agreements were primarily tacit understanding to lie for each other as part of the single conspiracy. Under conspiracy law, an agreement to do something illegal may be a tacit understanding. *United States v. Ryan*, 478

15

F.2d 1008, 1015 (5th Cir. 1973)(rejecting defendant's argument that "a tacit agreement cannot be an element of conspiracy" on the grounds that "the basis for this position appears to be the erroneous notion that the conspiracy must be bottomed on an actual overt agreement to commit a crime."). See also *United States v. Weiner*, 3 F.3d 17, 21 (1st Cir. 1993)("An agreement may be implicit in the working relationship between the parties that has never been articulated but nevertheless amounts to a joint criminal enterprise."). A tacit conspiracy can be demonstrated by the defendants' similar conduct toward the same illegal end, including the giving of similar false statements, particularly where the preponderance of the evidence (other than the statements) demonstrates that the statements were false. See *United States v. Simon*, 839 F.2d 1461, 1469 (11th Cir. 1988)(evidence was sufficient for jury to "infer [the agreement's] existence from the surrounding circumstances," including the circumstances that the defendants all made the same false representations about the oil and gas leases); *United States v. Veal*, 153 F.3d 1233, 1254 (11th Cir. 1998)("Reading [the defendants] strikingly similar statements together, the jurors fairly could have decided that the officers colluded to create the impression that they were innocent bystanders ...."). See also *United States v. Marchisio*, 344 F.2d 653, 667 (2nd Cir. 1965)(holding that "the proof that the

16

appellants' false statements before the grand juries and to the Bank Board were similar constituted circumstantial evidence of agreements to make false statements to these bodies.").

## V. APPLICATION OF THE LAW.

Applying these legal principles, I hereby enter the following findings based upon the preponderance of the evidence:

### A. THE I-395 SHOOTING.

A conspiracy existed at the I-395 Shooting involving Defendants Beguiristain, Aguero, Gonzalez, Quintero, Garcia, Hames and Mervolion. The conspiracy included each declarant and the defendants against whom the statements are offered. Each was made by the declarant during the course of and in furtherance of the conspiracy. As already discussed (and further discussed *infra*), the I-395 Shooting was part of a single conspiracy with the other three shootings.

The conspiracy began at the I-395 Shooting; however, as noted, the reasonable inferences, by their preponderance, substantiate that a core group of the CST/SNU officers, including Defendants Aguero, Acuna and Beguiristain, had already reached an agreement to plant guns at high profile shootings as needed to protect themselves and their fellow officers,  and to

17

make false and misleading statements to justify their actions in such shootings or to cover the actions of other members of their unit.   For instance, immediately prior to the I-395 shooting, Defendant Beguiristain had engaged in a conversation with Mervolion regarding planting a gun at a shooting involving Beguiristain where no gun was found on a fleeing felon who was shot at by Beguiristain.  Defendant Aguero and Acuna's actions with regard to throw down guns (as discussed below) support the inference that their intention to throw down guns did not suddenly arise with the I-395 and N.W. 7th Court Shootings.

The development and collocation of circumstances support that guns were planted at the I-395 scene by Defendants Beguiristain and Quintero, that Beguiristain and Quintero acted in concert, and that the other shooters joined the conspiracy to obstruct justice the next day. The planting of guns by Beguiristain and Quintero is supported by the preponderance of the direct and circumstantial evidence that neither Young nor Wiltshire had guns in their possession when they fled the police on the evening of November 7, 1995. The evidence is summarized as follows:

* Co-Defendant William Hames testified that he was working with the C.S.T. Central Unit on November 7, 1995. He was on patrol with Rolando

18

Sampson. They suspected a robbery was in process. This was later confirmed over the radio. They pursued to the entrance ramp of the I-395 overpass. He saw two black male subjects running to the railing. He was approximately thirty-five feet away. He observed both of them straddling the expressway overpass. He saw their hands. He saw no guns. Both subjects jumped to the ground below on Miami Avenue. One landed on the ground on his backside; he rolled forward to rise. Hames saw both his hands. He saw no gun. Hames fired his weapon because the subject was a forcible felon fleeing from apprehension and saw no other means to stop him. He heard other shots coming from his left. He did not know if he hit the subject. The subject tried, but failed, to rise from the ground. He then saw the second subject fleeing. Hames fired at him as well. He observed the second subject's hands as the subject was running. Hames could see his right hand the entire time he ran. He could see his left hand periodically. He did not see a gun in either hand. Once he stopped firing at the fleeing subject, he noticed the first subject lying on the sidewalk on the west side of Miami Avenue. The subject was not moving. He re-holstered his weapon and was making his way down the embankment when he heard Defendant Aguero say "this guy is not talking," referring to the first subject lying on Miami Avenue. Hames and Aguero went down the grass embankment to

19

North Miami Avenue. He saw Defendant Beguiristain on the far side of the fence that ran along Miami Avenue. Hames ran past the first subject. He looked at him as he ran by. No one was near the body. This evidence, by its preponderance, supports the inference that neither Young nor Wiltshire was armed with a weapon when they jumped from the overpass, when Young was shot, and when Wiltshire fled down Miami Avenue.

Hames further testified that he continued northbound on Miami Avenue and then stopped because he saw multiple police cars and did not know what was happening. He returned to the area where the first subject was lying by the sidewalk. He was part way there when he saw and spoke to Sergeant Ray Martinez. Based on what he heard from Martinez, he turned and looked at the subject lying on the sidewalk. He saw Defendant Beguiristain and a uniformed officer standing over the body. He was "pissed." He had learned that a gun had been found near Young's body. He thought that a good shooting had just gone bad because he believed that the subjects did not have a gun.

* Co-Defendant John Mervolion testified that he was partners with Defendant Beguiristain in the Crime Suppression Unit. On November 7, 1995, he was working an overtime detail with Beguiristain in Street Narcotics. Defendants Aguero and Garcia also were partners and, according to Mervolion,

20

rode together all the time. After hearing from Roland Sampson over the radio, they followed the suspects, heard the robbery took place, and then chased and crashed into the suspects' vehicle on the ramp of the I-395 overpass. At some point during the chase, he heard Defendant Garcia say over the radio, "They are shooting, they are shooting at us." No one else called out that shots were fired. Mervolion watched the subjects "bail out" of their vehicle. Two subjects ran east bound towards Mervolion along the side of the expressway. He heard someone say "Gun, Police, stop." Mervolion saw the hands of the two subjects. Neither had a gun. According to Mervolion, if the subjects had guns, they would have been shot before they jumped from the ramp. He was looking "real hard" when he heard someone yell "gun." He did not fire his weapon on the ramp because he did not see a gun. He expected them to stop. He did not expect the subjects to jump from the overpass, but he next saw them leap the rail and jump. He saw where they landed. He saw that one subject (Young) was wearing baggy jeans ("that are like two sizes too big...."). He did not see a gun in Young's waist when he was down on the ground. The subjects got up and started running towards the west. The shooting started at that point. He saw the first subject shot by the sidewalk. He went down. There was "a lot of blood." There was no gun. He focused his attention on the second subject and shot

21

two rounds as the subject was running towards the west. He put out a BOLO on the second subject. He did not say the subject had a gun because he saw no gun.  Later that night, he and the other shooters were taken to the police station.  None of the shooters gave statements that night. Mervolion knew at the time he was at the station that weapons had been recovered on the scene. The reasonable inferences [based upon the barbecue restaurant meeting the next day] supports that the other shooters also knew that weapons had been recovered at the scene.

* Lumene Johnson testified that on the night of November 7, 1995, she and two friends were driving in a car ready to get on the I-95 expressway when they heard gun shots, saw people on the expressway, and saw Young lying on the ground on the sidewalk under the overpass. They drove up to him, got out of the car, stood around for around three minutes, saw someone coming down from the overpass, and drove away. At the time they saw Young, no one was around on the street. They asked the boy if he was "all right." He was face down. They saw blood coming out from his side or his back. The boy was not moving. He said nothing. He appeared dead. They saw no gun around him. They saw nothing but the boy, the sidewalk and the grass. Someone came down and told them to get away from the scene. They described the

22

person as a white male, short and a little built.

   * Retired Officer Roland Sampson was a police officer with the City of Miami and was on duty with the Street Narcotics Unit on November 7, 1995. He was driving with William Hames that night, saw the vehicle with the four subjects, followed them in his vehicle, saw the robbery and reported it, arrived at the I-395 overpass, and saw one black male hanging from the expressway by his hands with his feet dangling and drop to the pavement below. Sampson walked down the embankment, saw no one in front of him as he descended, heard gunfire, sought cover, got up, looked down the street, saw one black male running northbound on Miami Avenue and turn west on 13th Street, and saw a body laying on the sidewalk . No one was near the body. No other officers were on Miami Avenue at the time. He went for his handcuffs, but had lost them on the embankment. He saw the subject [Young] laying there and saw some blood. He did not know if Young was dead or alive. He did not see a gun by Young, although he looked for his own protection.  He then began to chase the other subject because someone else yelled they had somebody in the alleyway. The inference from this evidence is that Sampson was satisfied there was no threat from Young before he left him uncuffed at the scene because Young was not moving and he saw no weapon around him. Sampson

would not have left Young uncuffed and chased the other subject [Wiltshire] if he felt any threat from Young.

* Sergeant Rafael Martinez saw Wiltshire running and turning on 13th Street. He had no recollection of Wiltshire holding anything in his hands.

* Officer Willie Bell has been a City of Miami Police Officer for twenty-three years. He was working with the Crime Suppression Team on November 7, 1995. He heard from Sampson over the police radio that there might be a possible robbery. He then heard that a smash and grab robbery was in progress. He followed the subject vehicle to the I-395 overpass. He saw two subjects jump from the expressway. He saw Defendants Mervolion, Hames, Gonzalez, and Garcia shoot at the subjects. The subjects were not returning fire. One subject (Young) was shot and laying face down. The second was running north. Bell saw that he was shot. The second subject [Wiltshire] collided with the first subject and tripped over him. Bell went down the embankment after them. He did not see Young move. He got within 15 feet of him.

Bell testified that he had a clear view of Wiltshire as he was running along Miami Avenue. He saw his hands. He was not carrying a weapon in his hands. He chased Wiltshire to 13th Street, lost sight of him and was told by

another person, "Bell, down the alleyway." Bell was familiar with the alleyway.

Bell entered the alleyway. He saw the subject crawling. Bell testified that he

was only ten to twelve feet within the alleyway when he grabbed the subject's

legs and yanked him back. He heard a thump. He said when he yanked the

subject, Wiltshire landed face down. The noise Bell heard could have been a

gasping or thumping sound. Bell thought he saw something come out of his

hand. "It could have been a flinch of his hand, I assume." He did not know what

it was. Bell said he saw that Wiltshire had two gun shot wounds on his

shoulders, and that there was blood coming out of both sides. Bell said he

never went past the first building in the alleyway which is only sixty-six feet into

the alley. Bell said, "[I]f the guy would have got this far (meaning further down

the alley), I would have lost sight of him and I wouldn't have traveled that far

anyway because there was no lighting, and I never went no farther than about

fifteen feet." He said he was not near the far end of the alleyway that night. He

looked around the grassy area where they fought. He said he would not get on

his hands and knees to search the alley because it was a drug den, loaded with

tossed needles, paraphernalia, and things like that.  He did not find anything.

He stated that he did not see a gun in the subject's hands when they fought.

After the fight, he was assisted by Officer Davis and another officer. He said

Davis met him within fifteen feet into the alley. Davis and the other officer were "trampling the whole area," after Fire Rescue took the subject away. Bell told them to let a canine do an article search and not "mess up the crime scene." He was later directed by a superior officer to return to the overpass. Sometime after, he showed Captain Rise and Lieutenant Fleitas where he caught the second subject [several feet within the alley]. Bell testified that he did **not** see Defendant Quintero that evening.

Davis testified that he spotted Bell in the alley. Davis and his partner were on 13th Street in their vehicle in the front of the alley. He could clearly see Bell from where he sat in his vehicle, even though the alleyway was dark. Davis exited the vehicle. He immediately went to help Bell who was trying to handcuff Wiltshire. He helped Bell place one cuff on Wiltshire. He saw nothing in the subject's hands. He did not see a gun around the subject. Davis said he was "half way up the alley" at the time.

The Browning found by Defendant Quintero was located almost at the end of the alley more than one-hundred feet from the entrance **and** around the corner from the first building in the alley which ends sixty-six feet from the alley's entrance. The inference from Bell's and Davis' testimony is that the weapon could not have landed where Quintero found it if the fight had occurred

26

near the entrance to the alley as Bell and Davis had testified. This evidence would be conclusive "but for" further evidence that approximately twelve feet from where Quintero found the gun, there was a small amount of blood on a small piece of foam, a rock and a lighter. This blood was a match with Wiltshire's DNA. The inference from this evidence is that the fight had occurred further up the alley than Bell and Davis remembered, and that, assuming Wiltshire had a gun, it could have landed in the area of the fight near the garbage dumpster where it was later found by Quintero. The preponderance of the evidence, however, supports Bell's testimony as to where the fight occurred. This is because Davis would not have been able to see Bell that night, given the lighting conditions and sight angle in the alley if Bell was located approximately one-hundred feet from the entrance and at an angle where Wiltshire's blood was found. Wiltshire's baseball cap was located near the entrance of the alley which supports an inference that it came off when the subject was on the ground and grabbed by Bell.

Another key conflict comes from Quintero's statement made at 3:14 a.m., on November 8, 1995, when he said that he saw Bell come out from "the back" (of the alley) and that Bell told Quintero that he was fighting with some guy back there. According to Quintero, Bell said that he finally got the subject

27

handcuffed because he was waiting for Fire Rescue and "he threw something in the bushes." Quintero says that Bell said, "I think it was a gun. I have not had a chance to look at it." This is contrary to Bell's testimony that he never saw Quintero or spoke with him at all. Based on Bell's purported statement that he fought with some guy "back there," Quintero stated that he went into the alley without a flashlight, crawled on his hands and knees looking through the bushes, and came across a blue steel nine millimeter weapon. The evidence does not support by its preponderance that Quintero would have been able to find the weapon within three or four minutes without a flashlight at that location, even if the fight happened where the blood evidence was found. All these factors support Beguiristain's statement to Mervolion that Quintero planted the gun at the scene.

    * Dr. Rodger Mittleman, Medical Examiner, examined Young's body at the scene. At the time, Young was laying face up, although Mittleman concluded that Young was probably face down and later turned over by emergency personnel since that would be consistent with the blood pattern on the sidewalk. An autopsy was performed on Young. He was struck by eight gunshots. One bullet immediately resulted in a spinal cord injury causing Young to be a paraplegic and literally drop in place. Another shot entered the

28

right arm above the elbow, while another gunshot projectile went downward in the thigh, and ruptured a femoral artery and vein. This also would cause Young to be incapacitated quickly, faint and pass out. The path of the bullets were from back to front. The inference from the testimony is that the collective effect of the gunshot wounds was to cause Young to be immobile, thereby giving no justifiable necessity for Defendant Beguiristain to remove the gun that he purportedly found near Young's body on the grass from the crime scene for safety reasons by the time he arrived. According to Crime Scene Investigator, Priscilla Miller, the usual practice is to leave weapons on the scene at or immediately near where they are found. Sampson's testimony also supports that Young did not pose a threat warranting removal of the weapon. Two further inferences are important. First, given Young's condition after he was shot, the weapon would have been located directly by him and therefore visible to Johnson and Sampson. Second, the further inference from Mittleman's testimony is that Young was not facing the police and firing a weapon at the time he was shot.

      * The forensic evidence supports that neither Young nor Wiltshire possessed a gun and further supports the reasonable inference that the guns were planted. No latent fingerprints were found on either the Sig Sauer or the

Browning. No blood was found on the Sig Sauer, although Young had blood on his both his hands at the scene. No casings or projectiles were found by crime scene investigators suggesting that no bullets were fired from the guns at the police. Likewise, no round was chambered supporting that the Sig Sauer was not fired nor was it capable of being fired. Furthermore, the Browning .9 millimeter purportedly recovered by Defendant Quintero did not have a round in the chamber. It bore no fingerprints of Wiltshire. Neither Young or Wiltshire had the presence of gun shot residue on their hands suggesting that neither weapon was fired by them.

* Because there is a preponderance of the evidence that Young did not have a gun, a reasonable inference arises from the circumstantial evidence that it was planted at the scene by Young's body by Defendant Beguiristain shortly after the police shooting. What happened next further supports that inference. Defendant Beguiristain approached Sergeant Rafael Martinez and advised him that he had the subject (Young's) gun. This occurred somewhere between the expressway and 13th Street. Martinez asked Beguiristain why he picked up the gun. He turned it over to Martinez who gave it to Lieutenant Guzman. While the prosecution did not ask Martinez to explain Beguiristain's response, Beguiristain did offer an explanation in his sworn statement of

30

November 8, 1995.

In his statement, Beguiristain stated that after he left the embankment, he saw a black male bleeding either on the street or the sidewalk. He was face up, in pain and moving around. This is contrary to the preponderance of the evidence that Young was face down at that time and, based on the medical testimony, was more likely than not moving around. Beguiristain stated that he saw the gun on the grass area and picked it up for officer safety. He stated that he advised Officer Aguero what he had done. At his Inquest statement, Beguiristain stated that he did not want Young to "grab the gun" which was about two or three feet from his body.

The reasonable inference from the circumstantial evidence is that Defendant Beguiristain carried the Sig Sauer with him from the ramp area after the shooting to the scene below or that the planted gun was given to him by one of the other shooters. The further reasonable inference is that he placed the gun on the scene to make the shooting appear more justifiable in order to protect his fellow officers. Because there were two subjects shot, another throw down gun was required for the second subject. As noted below, the reasonable inference is that Beguiristain told Quintero to bring the second gun.

* Hames testified that Sergeant Ray Martinez told him after the shooting

31

that "[T]hey had recovered a gun." Martinez said, "Art has it." He saw Defendant Beguiristain "standing over by Young on Miami Avenue." Hames testified that "I was pissed" because he had not seen a gun on the subjects. He believed that since the shootings were justified, there was no need for a gun to be there. Beguiristain approached him in the area near the expressway overpass and said softly that "Pepe is coming up." Hames believed he meant Defendant Pepe Quintero. He knew from his work at the C.S.T. Central Unit that Defendants Beguiristain and Quintero were close and associated with each other outside of work. From this evidence, the reasonable inference is that Beguiristain contacted Quintero to bring another throw down gun for the second subject. The further reasonable inference is that, during that conversation, Beguiristain and Quintero discussed the second gun's color to coordinate their story. As noted below, this becomes a common unifying link among the coconspirators. The independent external evidence supports by its preponderance that Pepe Quintero planted the second gun because Wiltshire did not possess a gun. From the preponderance of the circumstantial evidence, Defendant Quintero knowingly joined in a conspiracy with Beguiristain to obstruct justice and to cover up the shooting.

After Beguiristain told Hames that Pepe was coming, he approached

32

Hames and told him that the color of the gun (meaning the second gun) was "blue." The reasonable inference is that Beguiristain learned of the color of the second gun from Quintero so Beguiristain could tell Hames and the other shooters and coordinate their stories. Quintero, in his own statement given on November 8, 1995 and later at his inquest statement on April 2, 1996, specifically identified the Browning as a "Blue Steel Nine Millimeter." The color of the "throw down" guns was significant as a unifying factor to the statements of several Defendants. Beguiristain also identified the Sig Sauer as "blue steel" in his statement given on November 8, 1995.   On November 14, 1995, Defendant Jesus Aguero identified both pistols carried by the two subjects as "blue."  Defendant Israel Gonzalez, in his statement of November 14, 1995, identified Wiltshire as being armed with a "black or blue" firearm.   The reasonable inference is that Beguiristain or Quintero also advised Defendants Aguero and Gonzalez, as well as Hames,  about the color of the weapons to coordinate their stories.

* Other than Beguiristain and Quintero, none of the other I-395 Defendants gave statements during the early hours of November 8, 1995. The shooters were instructed not to speak with each other. Yet, later that day,

33

November 8, 1995, Hames testified that he, Art Beguiristain[4], Jesse Aguero, Jorge Garcia, John Mervolion and another individual, who John Mervolion later identified as Israel Gonzalez, went to a barbecue restaurant on Northwest 7th Avenue. There was no stated purpose before they left for lunch, but Hames testified that "there was no other reason for us to be there except to organize a story in order to substantiate the fact that guns were now on the scene when none were there before." Hames testified that Defendant Beguiristain was John Mervolion's partner and was "tight" with Defendants Aguero and Garcia who also were within the same unit. Beguiristain himself, in his statement, said he told Aguero that he had taken the gun from near Young's body. The reasonable inference is that Beguiristain talked to Aguero on the scene in furtherance of the conspiracy so that Aguero could tell the other shooters. Aguero's participation in two other shootings involving throw down guns supports this inference as well. Hames testified that nothing was said at first. Jorge Garcia looked around the table and said "What are we going to say?" The reasonable inference from this comment is that Garcia and the other participants knew by

---

4.

There is a conflict between the testimony of Hames and Mervolion as to whether Defendant Beguiristain was present at the barbecue restaurant. For purposes of this motion, the greater weight of the evidence supports that he was not, and that only the shooters were present to coordinate their stories. By that time Beguiristain had already given his statement.

then of Beguiristain and Quintero's statements regarding Young and Wiltshire possessing weapons. Hames replied that "I don't care what you guys are going to say. This is what I am going to say [referring to the shooting on the previous night]." Hames explained he meant that he had witnessed an "incredibly stupid act" and was in a "safety mode." He testified, "I wasn't going to allow them to try to come up with some kind of story that was going to put my safety and my freedom in jeopardy." He then ran through a scenario that he thought would cover the shooting. In order to justify the guns being found, "we had to come up with a story of why the guns were there." He told the others that everything took place as true, except that the two individuals had guns in their hands as they straddled and left the overpass and that the individual closest to him had a gun in his **"right hand"**; that the first individual came up to a sitting position with a gun, and that the second individual ran across Miami Avenue toward 13th Street with a gun in his **"right hand."** Hames testified that Jorge Garcia then said, "I didn't see that." Hames replied, "It is not important that we all see the same thing," meaning it was to their benefit that they not all see the same thing as long as the facts of the case were covered. According to Hames, Defendant Aguero then stated, when Hames finished his story, "That is why we call him Bill Shakespeare," meaning that Hames writes "good A forms." Hames

testified that if he told the truth, he would have handed up his fellow officers and effectively ended his police career because he would have been ostracized by the police department and would have been  placed in danger because he would not have received back up in future incidents.

*John Mervolion also testified about what occurred at the barbecue restaurant. Prior to the lunch, Mervolion had reported to work at the police station. Defendant Aguero tapped him on the shoulder and said that "all the shooters are meeting up at the Bar-B-Q Barn ...." One of the other officers, Felix Delgado, wanted to join them for lunch. Mervolion heard Aguero tell him that he could not attend and that lunch there was just for the shooters.

According to Mervolion, Defendants Aguero, Garcia, Gonzalez and Hames were present at lunch (besides himself). They went to the back of the restaurant. Defendant Gonzalez started the conversation. He said, "Listen guys, the reason we are here is so we are all on the same page before we go in and give statements on this shooting." Mervolion knew immediately why he was there when Gonzalez said "get on the same page." Mervolion felt uncomfortable. He did not see the need for this to happen. He did not object because "[T]hese are police officers that I work with and if I am willing to put down my life for them and they put theirs down for me, then I am willing to go

36

by whatever they say... including to lie." At that point, Hames took control of the situation and outlined the story to be told when "we" go to homicide on this shooting. The story was that the subjects came out of the car with guns in their hands, running toward the officers. The reason that no one shot at the time was because "we were in the line of sight of the other officers." When the subjects dropped down on the ground, they fell down with guns in their hands and were pointing up at the officers in a threatening manner and "that is when we started shooting at them."

* Within the next few days after the shooting, Mervolion talked to Beguiristain about the two guns. Beguiristain said he recovered the gun around Young's body and, according to Beguiristain, the guy was moving and close to the gun. While one interpretation is that Beguiristain did not plant the gun [otherwise he would have told Mervolion], the more compelling reasonable inference, based on the matters discussed above, is that Beguiristain did not want to directly admit to Mervolion that he planted the gun. The forensic evidence supports this observation, as well as the additional evidence in the next two shootings establishing that it was Beguiristain who found and removed guns for "safety reasons" in order to further the conspiracy. But, even if Beguiristain did not plant the first gun (and one of the other shooters or officers

37

did), the preponderance of the evidence supports that he conspired with Quintero to bring the second gun to the scene to be planted. Either way, Beguiristain engaged in a conspiracy to obstruct justice that was joined by the other shooters and then carried over to the next three shooting incidents as part of a single conspiracy.

According to Mervolion, Beguiristain also told him that Defendant Quintero brought the second gun to the scene that he recovered in the alleyway.   Beguiristain told Mervolion where he got the gun. He said that the I.A. Investigator, Ray Socorro, had given him the gun prior to transferring to Internal Affairs. When Socorro got on the scene and saw the gun he had given to Quintero, "... his eyes almost popped out, and he made a comment to Art that, I am going to have a helluva way trying to explain it if my prints show up on this gun." Mervolion knew Beguiristain, Quintero, Macias and Aguero to be personal friends. He knew that Socorro "hung out" with them.

* On November 14, 1995, Defendants Aguero, Garcia, and Gonzalez gave statements under oath. These statements were consistent with the one Hames said he would give. All of the Defendants stated under oath that the two subjects had guns. Aguero specifically said that one of the subjects [Young] had a gun in his "right hand" aiming at him. Defendant Garcia also said

that both subjects had guns in their right hands, although, according to Hames, he stated at the restaurant that he did not see that.  Defendant Gonzalez also stated that Wiltshire had a gun in his right hand. The reasonable Inference is that all these defendants joined in the false story suggested by Hames. The reference to the subjects having guns in their right hands also gives rise to the inference that they acted in concert to coordinate their stories and knowingly joined the conspiracy to obstruct justice as initiated by Beguiristain and Quintero.

 * Following the I-395 incident, Mervolion testified that he had a conversation with Defendant Gonzalez. According to Mervolion, Gonzalez said he wanted to talk to Mervolion outside in the parking lot. He basically told him, "John, I'm going to say this one time and you are not going to hear It ever again, that there is a big storm on the horizon that you shouldn't talk to anybody about this 395 case at all or what happened because when you least expect it, somebody is going to be wearing a wire."

In sum, the external evidence and the above statements establish by the preponderance of the evidence that the conspiracy to obstruct justice included each declarant and the defendant against whom the statement is offered, and that each statement was made during the course and in furtherance of the

39

conspiracy. As noted, the conspiracy began with Beguiristain and Quintero and was later joined by Hames, Aguero, Garcia, and Gonzalez. Each of the defendant's statements regarding the I-395 Incident was in furtherance of the conspiracy.

### B. The N.W. 7th Court Shooting.

The preponderance of the evidence supports that the single conspiracy to obstruct justice by planting guns at the scene of questionable police-involved shootings, and to make false and misleading statements to justify their actions at the shooting, continued at the N.W. 7th Court shooting on March 12, 1996, just five months after the I-395 incident. Here again, it was Defendant Beguiristain who swore under oath that he found the gun. This time he said it was in Richard Brown's right hand with his right finger on the trigger. Once again, he said he had removed it from the scene because of "safety reasons." This is a key unifying link connecting the two shootings as well as the N.W. 43rd Street Shooting. It is the same scheme that was involved in the I-395 shooting where Beguiristain claimed he found the weapon near Young. Similar to the I-395 situation involving Young, Beguiristain, in the N.W.7th Court Shooting, is the one who removed the gun from the scene and purportedly gave it to his superior officer when the preponderance of the evidence supports that there

40

was no necessity for safety reasons to remove the weapon. This is because Brown, like Young, according to the clear inference from the medical testimony, was visibly dead when Beguiristain and the SWAT officers re-entered Brown's apartment for the second time.

The conspiracy to obstruct justice is supported by the preponderance of the direct and circumstantial evidence that the subject, in this case, Richard Brown, did not have a weapon in his right hand; nor did he shoot twice at the police when they entered his apartment. As a consequence, the preponderance of the evidence supports that the weapon found in Brown's right hand was planted on him after the shooting. The preponderance of the evidence further supports that two shots were fired from the planted weapon to make it appear that Brown held the gun and shot at the police before the SWAT team returned the gun fire.

* The preponderance of the direct evidence is that the gun found in Brown's right hand as he lay dead in the closest was not his gun. Charlie Mae Ellis testified that the .38 caliber revolver in evidence (Government's B-16) (that purportedly was taken from Brown's right hand after the shooting) was not the gun owned and kept by Brown in his apartment. She testified that the gun owned by Brown was kept on top of the cabinet in a can to keep it away from

41

Janeka Brown who was 14 years old at the time. According to Ellis, he did not keep bullets in the gun. Brown had given her the gun to hold for a couple of days for protection. This occurred several months before the March 12th incident. She gave the gun back to him but did not see it in his apartment. She was familiar with what the gun looked like. She described Brown's gun as "an old rusty gun and the handle part was wood and its was brown." The gun removed from Brown's hands did not have these characteristics.

*Janeka Brown testified that James Brown was her great grandmother's husband. He adopted her and she called him her father. On the evening of March 12, 1996, she was asleep in the bedroom. Brown was in the living room. She was awakened to hear Brown yell out, "Who is it?" She heard pounding on the door of their apartment. She got out of bed and went to where Brown was. He was standing in the dining room area and shaking. He kept asking, "Who is it?" The pounding on the door continued. It sounded as if someone was trying to break in. Brown yelled to her to call the police. The telephone was in the bedroom. She ran into the bedroom, took it into the bathroom and called the police. At the time immediately proceeding, she saw nothing in Brown's hands while he was in the dining room. She knew he owned a hand gun which he kept in the kitchen cabinet during the daytime. At

42

night, he would take the gun and put in on the television located in the living room near the door. On the evening of March 12th, she did not see the gun on the television. She described the gun as old and rusty. It was black with a brown handle. She testified that the gun in evidence (B-16) was **not** the gun owned by Brown. Brown's gun was older and more rusty. The gun in evidence had a black handle, instead of brown, and was not rusty. She testified that Brown kept ammunition for the gun in the closest in the bedroom. It was kept in a box. At a previous time, on New Years Eve, Brown shot the gun in her presence at the sky using three bullets. She believed he had two bullets left. She never saw him put more bullets into the gun.

While in the bathroom, she called the police. She told them someone was attempting to break into their apartment. The police put her on hold. She then heard shots being fired from more than one gun. When the firing ended, she opened the door of the bathroom, started to walk out, when more shots started. She ran back into the bathroom and hid between the tub and the toilet. She did not see Brown when she first exited the bathroom. She waited a while after the shots stopped. She did not how long she remained in the bathroom. When she was walking toward the bedroom door, she looked in the closet. She saw Brown laying on top of the dirty clothes. He did not move or respond to

43

her. His right hand was on his chest and his left hand was down. **He held nothing in either hand.** She started to walk toward him and an officer yelled out for her to come out of the bedroom. The officer had a gun in his hand and carried a shield in his other hand. The officer was in the dining room. The door to the bedroom was open. She walked towards the officer with her hands up and was taken out of the apartment.

        * This direct testimony, by its preponderance, is that Brown did not have a weapon in his hands immediately before the shooting started and did not have a weapon in his right hand as he laid in the closest immediately after the shooting stopped. The compelling inference is that a weapon had to be planted in his right hand while he laid in the closet after Jeneka Brown exited the apartment. The direct evidence from Jeneka Brown's testimony (as supported by Charlie Mae Ellis) is that the weapon found in his hand was not the weapon Brown owned and kept in the apartment.  The further direct evidence from Jeneka Brown, elicited on cross-examination, is that James Brown was left handed. She never saw him use his right hand. All testimony from the shooting officers was that Brown shot at them with the gun in his right hand.

        * A critical issue to the case is whether Brown shot at the police

44

from behind the closet door with the gun in his right hand (as claimed by the officers). Defendant Beguiristain's sworn statement (Exhibit B-6) was that Brown came from behind the closet door with the gun in his right hand, with the right part of his body exposed. The statements of Acuna, Lopez, Fuentes and Macias were to the same effect. Beguiristain stated that at the time of the second entry he saw Brown lying on the closet floor. He appeared to be deceased. "We peered in, looked like he was deceased, he was still holding the gun up like right under his neck." Beguiristain stated that Brown held the gun in his right hand with his finger on the trigger. He grabbed the gun and gave it to Defendant Acuna. Acuna and Lopez's statements were to the same effect.

The preponderance of the forensic evidence is that Brown did not shoot the gun twice using his right hand. Gopinath Rao, the gunshot residue expert, testified that the Exhibit B-16, when test fired, left a tremendous amount of gunshot residue particles on the shooter's hand. At the scene, Brown's hands were swabbed using a gunshot residue kit. The results from the left hand showed very few unique particles on his left palm, but a tremendous number of particles present on the left web of Richard Brown's hand. Rao explained that a gun shot in that area could deposit a tremendous number of particles on

the hand provided that there was no intervening object and the bullet went directly from the gun into the hand. The uncontradicted evidence was that Brown was shot in the left hand in that area. The evidence did not support a compelling inference as to where he was located when that shot struck him. The reasonable inference, however, is that Brown did not use his left hand to fire the weapon given the testimony of the officers. Furthermore, the reasonable inference is that Brown would not have held the gun in his right hand with his finger on the trigger (as sworn to by Beguiristain) if he fired it with his left hand. Given the nature of Brown's gun shot wound to the left palm that exited through the back of his hand close to his wrist, the reasonable inference is that he would have dropped the gun immediately after being shot. He also received a gun shot wound to his left arm which went through the wall or bedroom door. This wound would cause blood spatter as would the wound through the left palm.

As to his right hand, Rao testified that Brown had no unique particles on his right palm and only three lead particles on his right web. Lead particles by themselves do not have significance. No barium or antimony was found on Brown's right web. Rao ultimately testified that it is inconsistent with firing a revolver from the right hand to have zero particles on the palm and three lead

particles on the web. He testified that he can conclusively say that Brown did not fire a weapon using his right hand.

* The .38 revolver in evidence contained no latent finger prints of value from Brown, although there were three latent prints found on the revolver which could not be identified. The reasonable inference is that Brown's fingerprints would be on some part of the weapon amenable to latent prints either when he used it during the shooting (as the officers claim) or when he handled it on New Years Eve or on prior occasions, if it were actually his gun. It also is significant that no other weapon was recovered from the apartment. If there was a second, rusty, old revolver in the unit (as Janeka Brown claims), it would have had to be removed by the officers to make it appear that the planted weapon was Brown's only weapon.

* The removal by Beguiristain of the weapon from the scene raises inferences that the gun was planted, and the defendants did not want to leave it on the crime scene for analysis and forensic documentation. The rationale for removal from the scene by Beguiristain and Acuna was that it posed a possible threat while held by Brown. However, Beguiristain, in his own statement, said that it appeared that Brown was deceased when he and Acuna re-entered the unit on the second occasion. The reasonable inference is that Beguiristain

47

could not say otherwise. The testimony from the medical examiner, Dr. Valerie Rao, supports this conclusion. Dr. Rao testified to Brown's several gunshot wounds. She noticed dust particles on Brown's pant leg which came either from a wooden door or wall as bullets came through. This suggests that Brown was already in the closet when bullets were fired through the wall or door.

Gunshot Wound C went through Brown's bowel and through his aorta, which is the largest blood vessel that supplies blood to the body. He bled massively into his belly area. According to Dr. Rao, he would go into shock and then subsequently die. It is a lethal injury. He would only be conscious for a few minutes before losing blood supply to the brain and then rendered unconscious. He would not be able to move after those few minutes. The inference from this testimony is that Brown was visibly dead by the time the SWAT team re-entered the apartment (approximately 15 minutes after the first retreat) and there was no physical safety reason to totally remove the gun from the scene except to further the conspiracy.

* Although no blood spatter expert testified for the Government, the physical evidence shows that blood patterns were all on the inside of the bedroom door, and not on the outside. Given the sequence of gun shots, the reasonable inference is that blood spatter would have been on the outside of

the bedroom door if Brown had been shooting with the right part of his body half out the door (as the shooting officers had testified). According to Dr. Rao, the six multiple gunshot wounds examined by her are not consistent with Brown having the right side of his body facing the shooters.

* Luis Perez was in charge of the SWAT team on March 12, 1996. Sergeant Acuna returned from the second entry into the unit and handed Perez the .38 caliber revolver in evidence. Perez took the weapon and handed it to one of his field duty lieutenants. He told the field lieutenant to put the weapon in his trunk. He did not see what was done with the gun.

* Under SWAT procedures, the "shield man," who was Defendant Lopez, was first into the apartment. The shield man is likely to take gun fire first and thereby protect the rest of the team. Perez asked Lopez that night or the next day if the shield had been shot and he said **no**. Notwithstanding, Perez saw a bullet mark on the shield when he first looked at it on March 12th. In his statement given on March 15, 1996, Lopez stated that he was near the bedroom door when Brown stepped around the door with the right half of his body and pointed a gun in his right hand at him. He stated that Brown brought up the gun and fired. Lopez stated that he felt it hit the shield and came back towards him. He stated he then saw another muzzle fire. He stated that he did

not tell the SWAT commander that the shield had been struck during the gun fight, even though he said he felt the impact. He did not explain why in his statement. The reasonable inference from this testimony is that the shield was **not** hit during the first entry into the apartment or else Lopez would have told his commander about it when he was first asked. The further reasonable inference is that Lopez had to change his story and say that the shield was hit after he saw or learned that the gun was planted.

Defendant Acuna wrote in his "after action report" on March 12, 1996 that the shield was hit one time. Without much doubt, the uncontradicted evidence is that one of the bullets fired from B-16 in evidence hit the shield. The question is when it was fired and who fired it. The reasonable inference is that it was fired by one of the defendants into the shield and muffled during the second entry to make it appear that Brown fired the weapon when it became evident that Brown did not have a gun in his hand and that an eye witness, a fourteen year old girl, was in the apartment. At this point, the shooting went from bad to worse. The .38 revolver, B-16, was then planted in Brown's right hand. The other reasonable inference is that this occurred sometime after the second entry. Defendant Acuna, not being one of the shooters, was not separated and had access to the crime scene, and, by inference, both the

shield and the revolver before they were brought back to homicide. The mushroom bullets either remained on the scene or, by reasonable inference, were planted before the forensic team reached the scene. The opportunity to include Macias in the conspiracy occurred when Beguiristain visited him in the hospital several days after the shooting. Macias did not give his statement under oath until May 1, 1996.

* The conspiracy to obstruct justice among Defendants Beguiristain, Acuna, Fuentes, Lopez and Macias can be inferred from their sworn statements and the development and collocation of circumstances. Although there is no direct testimony that the conspirators met to discuss their statements, as in the I-395 shooting, the circumstantial evidence, by its preponderance, establishes that the defendants knowingly coordinated their stories before their statements were taken and agreed to give the same consistent story. The internal consistency between and among the statements supports this conclusion. The conclusion is further supported by the external direct and circumstantial evidence that Brown did not have a gun which he fired at them at the time of the incident.

The sworn testimony of Defendants Beguiristain, Acuna, and Fuentes was taken on March 14, 1996. Defendant Lopez's sworn statement was taken

51

on March 15, 1996. Defendant Macias' statement was taken on May 1, 1996. The stories have the same essential elements. The Defendants all saw Brown run into the bedroom and then come out exposing the right side of his body with the gun in his right hand. Brown fired one or two shots at them before the police returned fire. Upon the second re-entry, Beguiristain, Acuna and Lopez saw Brown in the closet with the gun in his right hand and finger on the trigger. All stated the gun had to be removed for safety reasons. The essence of the story is to justify the shooting on the basis that Brown fired first, and to coordinate the reason as to why the gun had to be removed. The essential link between the stories was that Brown exposed the right side of his body and held the gun he fired in his right hand. The next link is that Brown held the gun in the closet in his right hand with his finger on the trigger. These essential elements are contrary to the preponderance of the evidence and provide circumstantial evidence that these defendants entered into an agreement to obstruct justice by fabricating the circumstances of the shooting in order to justify it. This was part of the single conspiracy to cover up bad shootings in order to protect themselves and their fellow officers. All of the statements were made in furtherance of and during the course of the conspiracy.

Beguiristain testified that, upon entry into the apartment, Brown ran from

the living room into the bedroom and slammed the door. Macias kicked the door. Lopez positioned himself in front of the door. Upon the second kick, Brown came outside, positioning himself with the right half of his body out and the gun pointing forward in his right hand. Beguiristain definitely remembered seeing the gun in his right hand. Beguiristain and the other officers returned fire after Brown fired. After the officers completed their firing, they regrouped outside the apartment. Beguiristain saw the young female exit the apartment. The young female said the subject was hiding in the closet. A few minutes later, someone saw Brown's foot extending from the closet. It did not look like he was moving. Acuna decided to move in, with the shield man up front. Beguiristain said they peered in and it looked like Brown was deceased. He was still holding the gun up right under his neck. They searched the room. Meanwhile, Beguiristain took the shield from Lopez and put it on top of Brown and grabbed the gun.

Acuna testified that he heard one of the officers yell, "there is a gun." Someone else yelled "drop the gun." Acuna stated he heard two shots fired, and a second later heard more shots. After the reentry, Acuna stated that Brown had most of his body inside the closet laying on top of what was a plastic laundry basket "with his hand grabbing a gun, **finger in a trigger** (sic),

53

what seems like a snub nose or revolver." Acuna stated that they did not know if Brown was "dead or alive", and they went in with the shield and removed the gun from the hand. Beguiristain handed the gun to Acuna who then handed it to Perez.

Defendant Fuentes testified that after Macias kicked the door, he saw the right half of Brown's body. "It came out, and he came up with the gun and he fired." He stated, "I saw the guy come up and I saw a gun. I saw him fire the gun." "It took maybe a half of a second for this guy to stick his head out, come up with the gun and fire. I remember seeing the flash of the gun and where it was directed which was toward me because I was in the center of the room, with my team members." He saw Brown fire once.

Defendant Lopez testified that Macias kicked the door. As the door came open, "the subject appeared and started to discharge a weapon." He came right from behind the door and started shooting. Part of the subject's body was concealed behind the door. Lopez could see the right half of his body. He had a gun in his right hand. The gun came up and pointed at him. He brought up the gun and discharged the firearm after he felt the impact on his shield.

On the second reentry, Lopez returned as the shield man. As he approached the bedroom door, he saw part of Brown's leg. He saw Brown with

a revolver in his right hand which was up to his chest. He gave his shield to Beguiristain to remove the weapon.

Defendant Macias testified that he saw Brown running toward the bedroom with the gun in his right hand and was pointing it at the policemen over his left shoulder. After Macias kicked the door, he saw Brown crack the door open. He pulled the gun out and fired two rounds at them. He could see him twist the right half of his body. He held the gun in his right hand and pointed it at Macias. He fired two rounds. He heard the shots and saw the muzzle flash. Macias fired after he was fired upon. "It was simultaneous."

### C. The "43rd Street Shooting."

The preponderance of the evidence further supports that the single conspiracy to obstruct justice by planting guns at the scene of questionable police-involved shootings, and to make false and misleading statements to justify the defendants' actions at the shootings, continued at the "43rd Street Shooting," which occurred on April 13, 1996. The participants involved in this aspect of the conspiracy included Defendants Beguiristain, Aguero, and Co-Defendant Mervolion. All three participated in the !-395 shooting. Beguiristain also participated in the N.W. 7th Court Shooting.  This third shooting occurred approximately one month after the N.W. 7th Court Shooting.  Similar to the first

two shootings, it was Defendant Beguiristain who swore under oath that he found a gun on the scene after Defendant Aguero had shot at Steven Carter following a robbery.  Like the first two shootings, the preponderance of the evidence, including both the coconspirator's statement and the independent external evidence, establishes that the subject did not have a gun at the time Aguero shot at him, and that Defendant Beguiristain planted one on the scene to justify the shooting.  A single conspiracy continued based on the overlap of participants, the existence of a common goal, and the nature of the scheme underlying the crimes charged. The common goal continued to be to lie about police-involved shootings. The nature of the scheme was to plant guns to cover for each other when an officer shot at a subject who did not have a gun. All the coconspirators' statements were made to other participants in the conspiracy during the course and in furtherance of the conspiracy.

The preponderance of the independent external evidence and the coconspirator statements establish as follows:

* Leonor Cleveland testified that she did not see a weapon on the subject who robbed her friend and herself shortly before the subjects were apprehended.

*The testimony of Confesor Gonzalez and Lawrence Elmherst

concerning where Defendant Aguero fired the shots at the subject, and where the gun was found, support the reasonable inference that the gun was planted at its location by Defendant Beguiristain. Defendant Aguero told Confesor Gonzalez that the subject pointed a gun at him at the rear of the residence located at 342 N.W. 43rd Street. Exhibit C-5 shows the location where Aguero fired at the subject. According to the sketch, the subject was approximately ten feet away when he fired at the rear of the yard located at 342 N.W. 43rd. Street. Three shell casings were found at that location. John Mervolion testified that he found the subject in a shed not far from that location. He identified the southwest corner of the house where the subject was apprehended. See Exhibit C1, photo 1073. Aguero did not tell Internal Affairs how far the subject ran after the shots were fired. No officer at the scene asked Technician Angrand to document or photograph where the subject was captured. The absence of such evidence gives rise to the inference that it was purposefully omitted.

The .38 Rossi was found on the other side of the fence, behind the residence located at 354 N.W. 43rd Street under a large tree, hidden in the bushes, and mostly covered by leaves with only the frame visible. The distance between the location and shell casings raises a reasonable inference that the

subject would not have been able to run that far and hide the gun when Aguero was shooting at him at a distance of ten feet, and then hide in the shed where he was found by Mervolion.

* The Rossi .38 revolver was processed for fingerprints. No fingerprints were found on the revolver, including those of the subject [Carter].

* The Rossi .38 revolver, Serial Number W149270, was traced, by the preponderance of the evidence, to the possession of Carlos Diaz, on November 21, 1995. On that date, Diaz also had a second gun in his possession which he kept, with the first gun, in the closest in his bedroom. Diaz testified that two police officers came to his residence at 1835 N.W. 2nd Court, Apartment Number 308, Miami, Florida, and arrested him for possession of marijuana and cocaine. He was placed inside a police vehicle. He could see his part of the duplex. The officers entered the house after breaking the door. Another car arrived. One officer exited. One officer who entered the house was identified as Hispanic looking, about 6'2", 240 pounds, with dark hair. Diaz identified him as Defendant Quintero. After that, more officers arrived. All of them went into the house. He described another officer as "another tall one" who also looked Hispanic. He saw one of the officers exit his house with a jacket that Diaz had bought earlier that day. He saw the officer

leave his house with a cloth blue bag with a string at the top. Diaz then was taken to the police station by one of the officers. He was kept in a holding cell, seated on a bench, and asked to sign papers identifying property taken from his home. At that time he saw one of the officers who entered his home take the two guns out of the blue bag. He saw the officer take the Rossi .38 and put it in the bottom of his left leg. The officer had his back turned to him. According to Diaz, he looked Hispanic and had kind of salt and pepper hair. The officer placed the second gun in the blue bag. Neither gun was returned to him. He did receive a receipt for the second gun, but not for the Rossi. Diaz could not recognize the officer in court.

* John Mervolion stated that he and Defendant Aguero responded to the Diaz scene in response to a radio call from Defendant Quintero. Diaz was already arrested by the time they arrived. Mervolion saw Aguero enter the Diaz's home. He remained five to six minutes. When he exited, he was wearing the jacket Diaz identified that he had purchased earlier that day. Aguero said to Mervolion, "It looks good on me, doesn't it?"

Mervolion further testified that Aguero gave him Exhibit C-2 in evidence, the Rossi .38, sometime after November 25, 1995. He stated that he was in the parking lot and was flagged down by Aguero. Aguero asked him to come

around to his car. He went to the trunk and gave him a paper sandwich bag with the gun inside. Mervolion stated that he had a Ford Explorer where he kept his canine. According to Mervolion, Aguero stated, "Nobody is going to mess around with your car with your dog." Aguero told him he had to hold on to the gun in case somebody needs it down the line. Mervolion put the weapon in his gym bag and placed it in the back of the Explorer. The gun found by Beguiristain had the same serial number as the one owned by Diaz.

At the time of the "43rd Street Shooting," Mervolion arrived at the scene with Defendant Beguiristain. He saw Defendants Acuna, Garcia and Aguero already there. A perimeter had been established. Mervolion was contacted by the K-9 officer, Dennis Williams. He joined Williams in a search for the subject. They went to the back yard and Williams received an alert. Mervolion and Williams apprehended the subject in a small shed attached to the house on the southwest corner. After Mervolion brought the subject to the front of the house, he stated he was approached by Defendant Beguiristain who said, "Jesse needs the gun." The reasonable inference from this testimony is that Aguero, or someone on his behalf, contacted Beguiristain to obtain the throw down gun. Mervolion asked, "Art, are you sure you want to do this?" Beguiristain said nothing. Both then drove back to the scene. Mervolion stated that he told

Beguiristain that the gun was in the black bag in the back of his truck next to the cage. According to Mervolion, Beguiristain retrieved the gun and walked to the house in the rear. Mervolion stated he walked toward the front of the house. He noticed Beguiristain walking to the corner of the yard. When Mervolion returned to where the subject was apprehended, he heard Defendant Beguiristain stating on the radio, "I recovered a gun." Mervolion stated that he walked to where the gun was recovered and recognized it as the same weapon he had given to Beguiristain and the one previously given to him by Aguero.

Prior to giving his statement, Mervolion stated that Aguero approached him at the station. He said, "Do me a favor John ... [D]on't tell them that you and I were partners that day because I can't get linked up to **another** gun." Mervolion agreed.

* Defendant Beguiristain gave a sworn statement to Sergeant Ray Socorro on April 13, 1996 which was recorded by Socorro in summary form in that the original tapes were missing. Beguiristain stated that the subject was apprehended, he conducted an articles search. He stated that during the search he located a nickel-plated revolver behind 347 Northwest 42nd Street.

* Defendant Aguero also gave a sworn statement on that day to Socorro. Aguero stated that he heard Sergeant Acuna yell at him that the

subject had a gun. He saw that the subject had his hands in front of him as if he was attempting to conceal or retrieve an item from his waistband. He stated that the subject ran to the rear of 342 Northwest 43rd Street.  As Aguero approached the rear, he observed the subject turn in his direction and point a hand gun at him. He fired several times at the subject because he feared for his safety. While he fired, he said the subject sought cover, then turned around and jumped a fence and continued to run. Aguero discontinued the foot pursuit and attempted to set up a perimeter.

### D. "The Coconut Grove Shooting."

Defendant Castello and Detective Jacobo reported at 8:05 p.m. on June 26, 1997 that they had shot a man with a gun by the 7-Eleven. Several seconds later, he said "we have a guy shot here." The preponderance of the evidence supports that, at the time of the shooting, Daniel Hoban was standing over another homeless person, Richard Gruskin,  who was holding a black Walkman tape player and not a gun. The preponderance of the evidence supports that the Walkman fell near Hoban after he was shot in the leg by Defendant Castello. It was taken from the scene as part of the conspiracy to obstruct justice. The preponderance of the evidence establishes that the gun found at the scene was the same one that Aguero asked Hames to clean of

fingerprints so it could be used as a "throw down" gun. The Government establishes a sufficient *prima facie* case establishing the chain of custody that the gun on the scene was the one taken from James Brown's apartment by Defendants Acuna, Aguero, Garcia and Hames. The evidence, by its preponderance, establishes that Castello asked his fellow SNU officers for assistance to obtain a "throw down" gun after it became clear to him that Hoban held only a Walkman in his hand and not a gun at the time Castello shot him; that Defendant Beguiristain requested Defendants Aguero and Acuna to bring the throw down gun from their police locker; that Acuna and Aguero arrived on the scene with the throw down gun, and that Aguero planted the gun near Hoban while Acuna distracted Major Rojas. Aguero's fingerprint was found on the gun.   Based on the collocation of circumstances, the preponderance of the external evidence supports a tacit agreement among Acuna, Beguiristain, Aguero, and Ronda to give false testimony to protect Castello. Castello joined the conspiracy by coordinating his story with the other defendants who all testified falsely to Homicide and the State Attorney that they saw a gun near Hoban before he was removed by Fire Rescue. The preponderance of the evidence establishes that this shooting was part of the single common plan to obtain throw down guns and to cover up questionable

63

shootings by fellow officers. It involved overlapping participants, including Aguero, Acuna and Beguiristain and implemented their common goal. All of the coconspirators' statements discussed below were part of the single conspiracy; the single conspiracy included the declarant and each defendant (as discussed below), and were made during the course and in furtherance of the conspiracy. The preponderance of the evidence is based upon the independent external evidence, as well as the coconspirator statements. The following is a summary of the evidence:

* Nicholas Riesco stated that, while in Coconut Grove, on June 26, 1997, he witnessed two homeless persons on the Quickie Mart side of Grand Avenue. One was laying down and the other was standing over him. The one laying down was on the sidewalk with his head protruding in an easterly direction adjacent to a red car. The two men appeared to be interacting. He saw no weapon in either of their hands. The one standing had a black Walkman in his hand and he wore headphones on his head. He next observed an unmarked police car come up from the Coco Walk side. The car stopped quickly. Two men jumped out of the car from the driver and front passenger side. Both drew their guns and yelled, "Police, Police, drop." One fired at the man standing.  He dropped and fell backwards. He was holding his leg.

According to Reisco, the lighting conditions more visible than what appeared in Exhibit D-1, photo number 1106.

* Adam Berry accompanied Nicholas Riesco that evening. He stated that he and Riesco were in Coconut Grove. He remembered that it was just about getting dark but the street lights were not on. He also stated that he saw "a guy standing, tapping his foot on another guy laying on the ground...." The person on the ground's head was halfway underneath the bumper of the red car. His feet were pointing away from the red car. He saw the standing man wearing headphones. He remembered the Walkman attached to the standing man's belt. He stated that neither the man standing nor the one on the ground had anything in their hands. He saw a cop car "roll up," two cops get out, stand by their doors, say "get down," "get down," and open fire. The man standing said nothing and made a gesture as if to say, "What am I doing?" Berry indicated the gesture as pulling both his hands back with the palms open. It was after that Berry heard the shots.

* Richard Gruskin was a street acquaintance of Hoban. On the night of the shooting, he knew Hoban for eight years. They were drinking buddies and "hung out" in Coconut Grove. On the evening of June, 26, 1997, Gruskin had just purchased beer at the Kwik Mart in the Grove. During that

evening, he saw Hoban in the parking lot of the Kwik Mart. Hoban had his Walkman in his hands. Hoban asked Gruskin to "come over" so they could share the six pack. The walked west towards the Post Office building. Gruskin sat down on the sidewalk with his feet in the street. He then lay down on the sidewalk. He was inebriated. Hoban was standing over him. Hoban nudged Gruskin with his foot, saying "Come on Rick" so they could drink beer. Gruskin then heard chaotic shouts and several gun shots. He saw Hoban fall down. He said to the shooters, "What is going on. You just shot my buddy." Police officers stood by Gruskin and told him to move away from Hoban. He was twenty or thirty feet away. Several minutes later he crawled to Hoban. He saw Hoban's Walkman near him. He stated that Hoban did not have a gun in his possession either before or after the shooting. He saw no gun near Hoban after the shooting. He denied that he thanked the police officer for saving his life.

　　　　　* Luis Kickasola, a paramedic lieutenant with the City of Miami Fire Department, stated that he received an alarm about a shooting at 8:06 p.m. He responded almost immediately since the fire station is only a few blocks away. It was approximately 8:13 p.m. He saw the victim of the shooting lying on the sidewalk on his back. His feet were directed eastward and his head was

pointing west on the sidewalk. He looked for a weapon. He saw that the victim was unarmed. He looked but saw no gun in the vicinity. The reasonable inference is that if a gun was dropped by the victim in the location between the sidewalk and the right rear tire of the red car, he would have seen it given the lighting conditions at the time. He identified the location of the victim in relation to the red car. He saw that the victim was wearing earphones. They were around his neck. He saw a "radio" lying on the sidewalk to his left. The victim said he was not shot and that he had fallen. He observed that the victim was shot in the upper right leg.

　　　　* Julio Mestas, a chief with the City of Miami Fire Department, stated he was in Coconut Grove when he heard the call dispatching one of the Fire-Rescue units. He proceeded to the scene. At the time he arrived, fire rescue had not yet arrived. He saw the victim. He proceed to the sidewalk where the person was shot. He looked around for a weapon for his protection. He saw none within the person's immediate wingspan. There was no weapon around him. He saw the second man (Gruskin) just to the west of the victim (Hoban). Hoban was in a prenatal position, sort of crouching down, with his head facing Coco Walk to the east and his feet facing west. He saw two plainclothes officers near Hoban. He assessed Hoban's injuries. Fire-Rescue

then arrived. He spent six minutes on the scene while Hoban was being treated. He noticed that Hoban had headphones from a Walkman. He saw the Walkman on the ground below Hoban. It was "like a 4 by 4 black box. It was located close to the fence. While he was in the area, no one removed the Walkman from the scene. He saw no gun in the area before he left the scene. The reasonable inference is that if a gun was located in the area adjacent to Hoban and the right rear tire of the red car after Hoban had been shot, Mestas would have seen it. Although Defendants Beguiristain, Castello, and Ronda stated in their sworn statements that they saw a Walkman on the scene on the sidewalk, the preponderance of the evidence is that it was later removed from the scene in order to help Castello.

* Thomas Lundstedt, with the City of Miami Fire Department, also came to the scene in response to a dispatch. He was directed to a patient sitting on the sidewalk on the north side of Grand Avenue. At the time, he was trained to make sure the area was secure for his safety due to a police shooting. When he arrived on the scene, he saw no gun at the location shown as D-1, photo 1028, although he was not looking in that direction at the time when he first arrived at the scene. He was on the scene for ten to fifteen minutes. He testified that Hoban was wearing earphones with the wire

dangling down.  He saw three or four plain clothes police officers standing in the vicinity of Hoban.

* David Carpenter, with the Special Response Unit, K-9 Detail, was working in Coconut Grove at the time of the shooting.  He heard about the shooting over his police radio.  He arrived on the scene and was with undercover officers from the Street Narcotics Detail, among other officers.  He initially worked to keep civilians away from the crime scene. He established the crime scene with yellow tape.  He saw Fire-Rescue arrive.  He watched Fire-Rescue attend to Hoban.  He stayed at the scene for a few minutes. He saw nothing in the area of Hoban or Gruskin. He stated he had a clear angle of vision from his vantage point to see Hoban head to toe. He could also see Gruskin sitting on the sidewalk. He could see the rear wheel section of the red car, including the curb area and the swale. He saw nothing in the swale area. The reasonable inference is that if the .45 Astra was located in that area, as depicted on Government Exhibit D-6, Carpenter would have seen it.

* Major Noel Rojas, City of Miami Police, responded to Coconut Grove after hearing about the shooting on his radio. He arrived five or ten minutes thereafter.  He asked Sergeant Ray Martinez, who was the supervisor

at the time of the Street Narcotic Units, certain questions about the shooting. He was dissatisfied with the answers, so he contacted two of his uniformed sergeants and had them canvass the area for witnesses. He saw Sergeant Acuna and told him to get his team together and canvass the area for evidence, specifically the weapon. Acuna acknowledged his command. At that point, the weapon had not been found. Prior to talking to Acuna, he had spoken to Defendant Castello who told him that he discharged three or four rounds as a result of an "armed 29," meaning an armed robbery.   After Acuna acknowledged his order, Detective Herrera from Homicide said that his group would do the search. After that, he was advised that a weapon had been found by the red car. Rojas saw the gun on the street in front of the right rear tire, between the curb and the street.

＊ Juan Herrera, a police officer with the City of Miami, stated that he arrived on the crime scene. He saw Defendants Ronda and Aguero. He also saw other officers around the red car, including Officers Perez and Mathis, Defendant Acuna, and Defendant Garcia. Acuna and Perez were on the sidewalk behind the red car. Herrera spoke to Acuna. He told him to get his people and Mr. Simms (Gruskin) out of the area; that is, out of the area of the immediate crime scene. The officers left with Mr. Gruskin. After speaking to

Acuna, he began to scan the crime scene himself. At that point, he noticed a handgun on the curb area between the red vehicle and the curb of the sidewalk. It was approximately 8:25 p.m. to 8:30 p.m. He did not know the location of the weapon before he found it. He had no problem seeing the gun from his vantage point which was in the vicinity of where the officers were prior to his arrival. It was dusk but still light out. He then advised Major Rojas that he found the gun. The reasonable inference is that, if the gun was located in that position, other persons (named above) in the immediate area would have seen it. A further inference is that the officers, including Acuna, would have seen it and reported it, but none said that they did.

      \* I.D. Tech Harris later took possession of the weapon from that location. The Serial Number was N 5417. It is an Interarms Astra, model M90. At that time, the right side of the weapon was facing up and the left side was facing down. There were no rounds in the chamber. The grips from the weapon were removed by Harris because there appeared to be a shoe print on the upper portion of the right grip. Further testimony established that the footprint was not from Hoban's or Gruskin's shoes.  Harris also removed latent prints from the right side of the weapon.

      \* As part of the investigation, Defendant Castello was required to

71

be separated from the other officers. According to Castello's FOP representative, Sergeant Yavneh, other plainclothes police officers took Castello aside and talked to him against Yavneh's recommendation.

* Lazaro Fernandez, a crime scene investigator with the City of Miami Police Department, arrived on the scene at 8:30 p.m. It was still dusk. He stated that he established the location of the .45 caliber pistol recovered from the crime scene. It was located as Item Number 6 on the orange cone on Government Exhibit D-6 (crime scene sketch). The cone was located immediately by the right rear tire of the vehicle identified as V-4 (red car) on the crime scene sketch. He also was directed to search for the body of the Walkman radio. After an extensive search, it was not found. Government Exhibit D-6 shows the location of the vehicle Defendant Castello was driving and the location of the three spent .40 caliber casings. The evidence establishes that Castello was located about 50 feet from Hoban when he exited the vehicle and fired his Glock. The reasonable inference is that Castello could not clearly see what was in Hoban's hand from that distance when he fired his weapon; that, based on the above testimony, Hoban held a Walkman in his hand, and that Castello needed assistance from the SNU officers to help him cover up a problematic shooting. This last inference is further supported by the

72

testimony detailed by Mervolion and the police tapes.

      * Peter Belcastro is a retired FBI fingerprint latent expert. He examined Government Exhibit D-2, the Astra .45 caliber pistol found at the scene. At the time he examined the pistol, it already was processed for latent prints. The process for latent prints revealed one latent fingerprint. It was visible on the weapon. He used a laser and chemical process to enhance the print. The latent fingerprint was found on the weapon on the left side near the safety. The base of the finger making the print was pointed down the weapon. From three latent fingerprint cards (nine lifts)(D-10), he identified the latent print as left little finger belonging to Defendant Aguero. The surface of the weapon was blue steel, a good surface for retaining a latent print. There were no other latent prints of value on the gun for identification purposes. According to the witness, it was not a glancing touch of the weapon. The reasonable inference is that Defendant Aguero handled the weapon at some point. From other evidence, Aguero did not hold the weapon as part of the official investigation of the Coconut Grove Shooting and his print should not have been on it unless he planted it. It should not have been on the weapon if it belonged to Hoban. No latent prints of value showed that Hoban had handled the weapon. The fingerprint was on the side of the weapon at the scene.

73

* Lt. Edward Martinez, City of Miami Police Department, worked with the Homicide Unit at the time of the shooting. He was the lead investigator. He arrived at approximately 8:40 p.m. The scene was roped off in a large area. He did not know if a gun had already been identified at that time or not. He was told that a gun was found some twenty minutes after he arrived, but he did not look at it. He gave directions for any and all evidence to be found, specifically the Walkman radio. It was never found. As part of the investigation, radio transmissions were collected including channels by which plainclothes officers could communicate. Transcripts were prepared of the SNU communications. The transcripts indicated that Defendant Aguero arrived at the scene at 8:17 p.m. He asks, "Where are the dogs? We'll go where the dogs are." No other reference on the transcripts was to "dogs." According to the Lt. Martinez, canines were not involved in the investigation when he arrived.

The tapes also show that John Mervolion was on the scene and was with Gruskin. On another channel, the officers communicated without a dispatcher. On that channel, Defendants Beguiristain and Acuna communicated at 8:09 p.m. Beguiristain tells Acuna that "One of our 'UC's (undercover) got into a shooting here ..uh..ASL?'" Acuna asks Beguiristain, "Do you need me to bring anything from the locker?" There was no response, although the reasonable

74

inference is that a no response was meant as an affirmative. At the station, the lockers in the men's bathroom are personal lockers and can be locked. Acuna arrived at the scene. His specific assignment was to remove the victim (Gruskin) from the scene. The reasonable inference, when coupled with other testimony, is that Acuna is inquiring whether to bring a "throw down" gun from his locker and did bring one which was planted by Defendant Aguero and which bore his fingerprint.

* Kenneth Sea owned the Astra .45 pistol, which bears the same Serial Number as Government D-2 in evidence. He purchased it in 1992 with a receipt that bore the same serial number. Sea recognized the weapon as the one he owned. He was very positive about his identification and his testimony is persuasive for chain of custody purposes. He owned it for a year to a year and one-half. It came in a box. He sold it to Ray Garafolo in 1994 with the same box and clip. Garafolo testified that he purchased it from Sea with the box and two clips. The box bore the serial number of the gun. No paper work was done. He kept it for one year. He sold it to Peter Hope. He gave Hope the gun and one clip. No paper work was done. He recognized Government D-2 as the gun he owned. Peter Hope stated that he purchased the Astra .45 automatic from Garafolo in October, 1995. He remembered the gun having a red dot, big

75

grips and the letters C.I.A. on the barrel. He recognized D-2 as the weapon he owned. He did not know the Serial Number. He stated that he was in the process of moving to Overtown to the Sanford Apartments located on 19th Street and Second Court in November, 1995. He was moving into the apartments with his wife and mother-in-law, Valerie Johnson. He gave the gun as collateral for a loan to a friend of his mother-in-law, Porter Thompkins. The understanding was that Thompkins would return the gun upon repayment. The gun was never returned to him. Thompkins wrapped it up and put the gun in the back of his truck in a tote bag where it remained. He described the gun as a .45 black in color. He kept the gun for a month and one-half in a bag in the back of the truck. He never used it. He stated that he gave it back to Valerie at the apartment building.

\* Rochester Bronson stated that he was the maintenance man at the same apartment at which Valerie Johnson resided. He knew Valerie Johnson. Johnson lived at the apartment for about two years. He also knew James Brown who resided at the back of the building. He stated that there came a time when Valerie Johnson gave him the .45 caliber black gun to sell for her. He remembered that the gun was black with a red spot on it on top of the handle. He also said at the bottom it had a little silver piece. He said the

red dot on Government Exhibit D-2 looked like the red dot on the gun. Bronson

took the gun to James Brown at his house immediately after Valerie gave him

the gun. He knew Brown to be a drug dealer.  Brown gave him a hundred

dollars for the gun and Bronson delivered possession to him on that same day.

          *  James Brown stated that he resided at 1835 N.W. 2d Court.  He

admitted that he sold crack cocaine to Sally Bronson three or four times. At that

time he was selling crack cocaine, Chester Bronson came to him with a gun to

give Brown in exchange for crack cocaine and money.  Brown stated that

Bronson brought him the gun at his apartment. The gun was wrapped in a

cover. He looked at the gun before he bought it. The gun was  black and was

an automatic. It had a red dot on the gun near the safety.  With reference to

Government Exhibit D-2 (without grips), he said the red dot was in the same

place, although he said that the gun only had one red dot (while D-2 in

evidence has two red dots). It was the same color, but it looked different to him

because the gun in evidence did not have handles and the clip in place. He

kept the gun for three or four months, but he was not certain as to the exact

time. He kept it in a drawer in his bedroom. While he could not identify the gun

as to brand or serial number, he was unequivocal that he received the gun from

Chester Bronson, and that the last time he saw it was when the policemen took

it after his arrest. He was arrested for selling crack cocaine. He did not remember the exact date, but it was in February, 1996. He was not using crack cocaine that day or the day before. Two policemen came to his door. He knew he had the gun and crack cocaine in his apartment. He knew it was illegal to have the gun because he was previously convicted of a felony.   He remembered that the two officers were white. The gun was located in his bedroom at the time. They asked if he had drugs in the house. Brown said he did. One policeman told him his rights. The other went into the bedroom and came out with the gun. He also took possession of the crack cocaine. Brown signed the arrest affidavit. It was dated February 11, 1996. The arrest form also had two signatures of the officers.   The form (Government D-25) listed the names of Defendants Aguero, Garcia, Hames and Acuna. At that time, Brown had no other guns in the house. He stated he only possessed that one gun. After he was arrested, he saw other officers when he was placed in the police vehicle. He believed they were undercover "jump out" officers. He never was given a receipt for the gun. He never saw the gun again.

   * Williams Hames testified that in 1998 he was assigned to the firearms training unit. He was not on loan, but he periodically worked with the Crime Suppression Unit on weekends on an overtime capacity. His job was to

train officers to qualify for range purposes. He did maintenance on the weapons. Officers who had problems with weapons would bring them to Hames for service or replacement. Once a weapon was received, he would log in the weapon as to whom it came from and identify it by serial number and make. The weapons would be stored at the range itself until picked up by the officer.

During the time Hames worked at the armory, Defendant Aguero called him about a gun. Hames remembers it was shortly before the Grove Shooting incident. Aguero asked if Hames could do him a favor. He asked Hames if he brought him a gun to the range, could he wipe it down for him; that is, clean the fingerprints off of it. Hames said he could do that for him. Within the hour, Aguero came to the range carrying a workout bag. He pulled out a handgun and gave it to Hames who was at his desk at the armory at the time. Hames saw that the weapon was a semiautomatic pistol as opposed to a revolver. It was mid to large size and was dark in color. Aguero repeated his request that Hames should remove the fingerprints from it and call his office and speak to Jose Acuna since Aguero had to go to court. Aguero said that Acuna would come down to pick up the gun. Hames told Aguero it would take an hour or so to do the job. Hames did not log in the gun. He stated he knew he was doing

something that was unauthorized and, therefore, he could not document it. Hames stated that he took the gun to his work bench and consulted a Gun Digest book to review a schematic showing how the parts related to each other. He remembered he consulted the Astra brand of gun in the manual. He broke down the gun into its component parts and cleaned them using kerosene. He wore latex rubber gloves. When he was finished, he wrapped it in a paper towel and placed it in his desk drawer. He called the Crime Suppression Unit and spoke to Acuna and told him the gun was ready. Acuna said he and Aguero would pick it up. When they arrived, he, Aguero and Acuna went into the hallway immediately outside the armory doorway. Hames gave them back the gun wrapped in the paper towel. Aguero put the gun in his bag.

There was a time Hames worked Overtown as a patrol officer. He made drug arrests in the area. When he was part of an arrest with other officers, the arresting officer writes an A form. There are occasions when other officers may do it. With regard to property receipts, anyone in the chain of custody can fill out the receipt. If during a drug search, one officer may be designated to do the paper work. Hames recognized his signature on the property receipt, Government Exhibit D-28. His name appeared on the arrest form as the person who turned the evidence in. Hames did not recall the incident. He does

not recall if he seized evidence at the scene. The signature on the A form was Defendants Garcia and Aguero. D-27 was the 301 report as to the same case number. The arrest report said that Aguero found the drugs in the bedroom. Hames has no recollection of taking a gun from the scene. Government Exhibits D-25 and 27 document the arrest of James Brown and Sally Brown. D-28 are property receipts for the cocaine checked into the police department. There was no property receipt for a gun.

*John Mervolion also participated in the arrest of James Brown. He said that Defendants Acuna, Aguero, Garcia and Hames entered the apartment where the arrest was made. He saw Aguero carry a box downstairs. Mervolion authored the field interrogation card on Sally Bronson.

* John Mervolion stated that on June 26, 1996 he was assigned to Street Narcotics and was working on a buy-bust operation in Coconut Grove. He was with Defendants Beguiristain, Ronda and Sergeant Ray Martinez. While apprehending individuals in a sting operation, he heard several gunshots to the east toward Coco Walk. Sergeant Martinez yelled that "our guys" are involved. He saw a subject running towards him which he apprehended and let go. He proceeded to where Simms and Hoban were located. He saw Defendant Castello and Rolando Jocobo. He saw Castello run past him and

81

have a conversation in Spanish with Ronda, Beguiristain and Nogues outside of the bicycle shop [where the initial sting arrest was made].

As a result of a conversation with Jacobo, he asked Hoban where the gun was. Hoban said, "What gun?" Mervolion was standing immediately by the red car and Hoban. He did not see a gun. He did see the Walkman and placed it down next to Hoban. About fifteen minutes later, Mervolion saw Defendants Acuna and Aguero walking up to his location from the west. They arrived together in a black Explorer which was parked on the north side of the avenue further west from the red car. Mervolion was with Dennis Williams at the time. He said to Williams, "Dennis, let's get the hell out of here. I want no part of what is going to happen." He and Williams walked away from the immediate area. A five minute interval passed. During that time, he saw Aguero and Acuna on the sidewalk near the red car. He also saw Defendants Garcia and Beguiristain briefly. Other officers were also standing around. Defendant Aguero called to Mervolion and said, "Big John, stay right where you are at for a second." He looked to his left and saw Aguero pull a gun from underneath his shirt and drop it. Mervolion saw this by watching between the two windows of the red car. At that time, he saw Acuna talking to Major Rojas. Afterwards, Mervolion made a statement under oath that was evasive. He said in the

statement that he was not in a position to see a gun. He said this to protect his fellow officers.

    \* On July 15, 1997 and July 16, 1997, Defendant Beguiristain gave sworn statements to Homicide and to the State attorney (19 days after the shooting)(Government Exhibits D-29 and 30). He stated that he was in Coconut Grove at approximately 8:00 p.m. involved in a sting operation unrelated to the Hoban shooting. He was with Defendant Ronda. He heard three or four shots being fired. He went to the immediate scene. He saw a drunk on the ground and the guy that was shot. Fire Rescue was there. He asked Ronda if they had found the gun. Ronda told him they had and pointed to the gun. He stated that it was underneath a car right where Ronda was standing. He said he looked down and saw it. At the time he saw the gun, both Hoban and Gruskin were there. The reasonable inference is that Beguiristain lied about seeing the gun because it was not planted by Aguero until after Hoban was removed by Fire Rescue. Taken with the statements of the other defendants, the further reasonable inference is that the defendants colluded to give a false statement either before or after Aguero dropped the thrown down gun.

    \* On July 15, 1997, Defendant Castello gave a sworn statement to

the State Attorney. Government Exhibit D-31. He stated that he heard about the "buy-bust" over the radio. Eventually, he and Jacobo were driving over to that area. On the way, Jacobo stated that a guy had a gun. He turned to look. They were south of the Post Office on Grand Avenue at the time. He saw Hogan holding a man down with his leg and pointing a gun at the other man's head. He saw the gun clearly. He stated it looked like a "blue steel type." He yelled, "police," "drop the gun." Hoban turned to face him for a couple of seconds. He stated Hoban pointed the gun at him with both hands. Castello said he saw the barrel. He stated he yelled, "drop it" for a final time. After that, he stated he fired three times. After he approached Hoban, he stated he saw the gun by the curb; that is, at the sidewalk two or three feet from Hoban.

       \* On July 15 and 25, 1997, Defendant Ronda gave sworn statements to Homicide and to the State Attorney. Government Exhibits D-32 and 33. He stated that he heard shots fired to the east of where he was located in Coconut Grove on Grand Avenue. He started to run in that direction. Other team members ran with him. He saw a black male running towards him who was taken down and released. He saw Defendant Castello with his gun out on the south side of Grand Avenue. He told Ronda he was involved in a "discharge." Ronda saw Hoban. He saw Jacobo nearby. Jacobo told him "we

had an armed twenty-nine and we were involved in a discharge." Ronda asked

where the gun was. He pointed out the location of the gun. He stated that he

saw the gun in the gutter next to the curb and adjacent to the [red] car. He

identified it as a blue steel semiautomatic pistol. The reasonable inference from

this testimony is that Ronda gave false testimony that he saw the gun before

Hoban was removed from the scene by Fire Rescue.

   * Officer Burt Bell, a City of Miami Police Officer,  stated that, at a

time prior to the Coconut Grove Shooting, Defendant Aguero approached him

in the parking lot of the central police station and asked  Bell if he could give

him a "sock." At that time, Bell, was assigned to the firearms range. He  did not

understand what Aguero meant. He asked Aguero, "What the f–k a sock was?"

Aguero answered, "You know, Burt, a throw-down." He replied, "No, Jesse, I

don't have a throw-down." This evidence was admitted only against Aguero as

intrinsic to the conspiracy. The reasonable inference is that Aguero knew about

throw down guns and wanted to obtain another one in the event it was needed

to protect himself or his  fellow officers in his unit. It also corroborates John

Mervolion's testimony regarding Aguero's request for a throw down gun at the

"43rd Street Shooting."

   For the reasons stated above, it is hereby **ORDERED** that the Rule

801(d)(2)(E) statements are found to meet the applicable rule criteria and are

re-affirmed as admitted.

ORDERED this 3rd day of March, 2003.

ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

All counsel of record by hand delivery and under seal.

cc:    Magistrate Judge Robert L. Dube

AUSA Allan B. Kaiser
AUSA Curtis Miner
99 NE 4th Street
Miami, Florida 33132

Roy Kahn, Esquire for Jose Acuna
799 Brickell Plaza
Suite 606
Miami FL 33131

Manuel Casabielle, Esquire for R. Fuentes
2420 Coral Way
Miami FL 33145

Richard Sharpstein, Esquire and
Janice Burton Sharpstein for Beguiristain and Castello
777 Brickell Avenue
Suite 500
Miami FL 33131

Harry Solomon, Esquire for E. Lopez
799 Brickell Plaza
Suite 606
Miami FL 33131

**William D. Matthewman**, Esquire for A. Macias
Seiden Alder Rothman
2300 Glades Road
Suite 340-W
Boca Raton, FL 33431

**Hugo A. Rodriguez, Esquire** for Aguero
150 West Flagler Street
Suite 1565
Miami FL 33130

**John William Thornton, Jr.**, Esquire for Jorge Garcia
200 S. Biscayne Blvd.
Suite 3420
Miami FL 33131-2310

**Jay Moskowitz, Esquire**, for Israel Gonzalez
3225 Aviation Avenue
Suite 300
Coconut Grove FL 33133-4741

**Sam J. Rabin, Esquire** for Jose Quintero
799 Brickell Plaza
Suite 606
Miami FL 33131-2808

**Albert Levin, Esquire** for Oscar Ronda
888 Brickell Avenue
Sixth Floor
Miami FL 33131